FOSTER v. BENNETT et al.   (No. 806.)

(Court of Civil Appeals of Texas. Amarillo. June 12, 1915. Rehearing Denied Oct. 23, 1915.)

1. APPEAL AND ERROR ☞730 — ASSIGNMENT OF ERROR.

An assignment of error that the court erred in giving its special issues to the jury and in refusing those requested by the defendant in his bill of exceptions cannot be considered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3013–3016; Dec. Dig. ☞730.]

2. APPEAL AND ERROR ☞739—ASSIGNMENTS OF ERROR.

To sustain an assignment of error that the court erred in giving its special issues to the jury, and in refusing to give those requested by defendant, it must appear that every special issue submitted was improper, and that every special issue requested was good.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3034–3036; Dec. Dig. ☞739.]

3. JUDGMENT ☞256—VERDICT TO SUPPORT—EVIDENCE.

Assignments of error which attack the action of the court in founding its judgment upon issues not submitted and not requested by a party, partly on the verdict of the jury, and partly on the court's conclusions from the evidence, is without merit, in view of Rev. St. art. 1985, providing that, where a necessary special issue is not submitted nor requested, it shall be deemed found by the court in accordance with the judgment, if there is sufficient evidence to support it.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 446–454; Dec. Dig. ☞256.]

4. APPEAL AND ERROR ☞263 — GENERAL ASSIGNMENT—IMMATERIAL ISSUES—EFFECT.

An assignment of error based on the court's refusal to submit an issue cannot be considered where the specific issue requested and others which were properly refused were requested and rejected as a whole, and no exceptions reserved.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1516–1523, 1525–1532; Dec. Dig. ☞263.]

5. APPEAL AND ERROR ☞1070 — HARMLESS ERROR—FAILURE TO FIND—WHEN CURED.

Where, in an action against a surety on a note, the defense was that defendant undertook the suretyship as part consideration for the purchase by him of stock in a milling company, and that his purchase was induced through misrepresentations of the plaintiff as to financial condition of the company, the failure of the jury to find on such issue was rendered immaterial by their finding on another issue that plaintiff submitted a true statement of the company's affairs to defendant, and the further finding that defendant had full access to the books of the company, it appearing from the record that the statement submitted readily disclosed the true affairs of the company to a man of average business intelligence such as defendant was shown to be, since one who has at hand the means of ascertaining the truth is held to the knowledge of that which he might readily ascertain, and will not be heard to say that he relied on other statements to the contrary.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4231–4233; Dec. Dig. ☞1070.]

6. APPEAL AND ERROR ☞216—OBJECTION BELOW—SUFFICIENCY—SUBMISSION OF ISSUES.

On the issue whether the purchase of stock was induced by false representations as to its market value, where the court submitted the question whether the representation made was of the market value or book value, error therein was not reviewable on appeal in the absence of any request for submission of the question whether the representation as to the market value was made.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. ☞216; Trial, Cent. Dig. §§ 627–641.]

Appeal from District Court, Baylor County; Jo A. P. Dickson, Judge.

Action by R. G. Bennett and others against J. S. Foster and another. Judgment for plaintiffs, and defendant Foster appeals. Affirmed.

D. A. Holman and Glasgow & Kenan, all of Seymour, and Ocie Speer, of Ft. Worth, for appellant. Arnold & Taylor, of Henrietta, Leslie Humphrey, of Wichita Falls, Joe A. Wheat, of Seymour, and Sporer & McClure, of Jacksboro, for appellees.

HENDRICKS, J. W. A. Bennett, R. G. Bennett, Arthur Power, and E. D. Power were the owners of 303 shares of stock in the Seymour Mill, Elevator & Light Company. On the 31st day of December, 1909, 110 of said shares were transferred to the appellant Foster, 90 shares to J. T. Cockrell, and 103 shares to C. W. Abbott. In the negotiations resulting in the transfer of all the stock to the parties mentioned in the amounts indicated, it seems that the trade with each of the three parties, calling for a transfer of the amount of stock to each, was conditioned by the vendors upon a transfer of the whole.

M. R. Fuller was the manager of this corporation, and prior to the change in ownership of the 303 shares W. A. Bennett had agreed with Fuller that, if the latter would make an acceptable disposition of his stock and interest in the mill, he would reserve and assign to the latter 20 shares of said stock. By the efforts of Fuller, Bennett, who resided in Memphis, Tex., and Foster, who lived in Seymour, were brought together, with the result that 100 shares of the Bennett stock were traded by the Bennetts to Foster for a one-fourth interest in the Lankford addition to Seymour, Tex., consisting of 140 acres; and in the trade Fuller, upon Foster's demand, assigned 10 shares of the 20 going to him as commission, in order to effectuate the trade. Abbott was unable to pay for his 103 shares, except the sum of $1,000, and, as a part of the consideration of the trade with Bennett, Foster became Abbott's surety upon the notes executed by the latter, said notes representing the greater part of the consideration for the Abbott stock, the said stock to remain with Bennett as additional security for the Abbott notes.

Foster asserts against this suit brought by the Bennetts upon the Abbott notes that his part of the trade was produced by the false representations of Fuller, the plaintiff's agent, alleging in the last answer filed by him that:

To "induce the sale * * * Fuller represented the market value [of the stock] at that time to be $1.14, on the face value, and that said corporation only owed from $7,000 to possibly $13,000, dependent upon liability for the Bellows note for $5,000, except the debt owing by it to the First National Bank [of Seymour], which he estimated to be about $23,000 or $24,-000, and that it had bran, wheat, flour, solvent accounts, notes and money on hand sufficient to pay off the bank debt."

The following are all of appellant's assignments of error, which were numbered by appellant in accordance with the enumeration in the motion for new trial, and by us consecutively for convenience:

First. "The court erred in giving its special issues to the jury; and in refusing to give those requested by defendant, as shown in defendant's bills of exceptions Nos. 3 and 4."

Second. "Because the verdict of the jury is insufficient to warrant any judgment for either party, without resort to the testimony to aid the court in framing a judgment, which is contrary to law, and was rendered on special issues submitted to the jury which were not made issues in the pleading, and as to them should not be considered."

Third. "The judgment of the court is contrary to law and the evidence, in this, to wit [giving the subnumbers]:

"(1) Because when the verdict is founded upon special issues alone, the court cannot look beyond it to any fact apparent upon the record in aid of the judgment.

"(2) The court cannot look to the evidence on which the verdict was rendered in order to render judgment; but must look alone to the verdict.

"(3) A judgment resting partly on special verdict and partly on the court's conclusions of fact cannot stand."

Fourth. "The court erred in failing to submit as to whether Foster believed and relied upon the representations of Fuller, and was induced thereby to enter into said contracts, and then, refusing to submit the special issues, presented in writing by the defendant, with request to submit that issue to the jury."

Fifth. "The judgment is contrary to the law, because founded upon an erroneous assumption of law that the fact that Foster, after December 19, 1909, when Foster learned that there were more debts than represented and contracted for, and he, Cockrell, and Abbott by letter demanded a rescission, continued, in connection with other directors, to carry on the business, was an election to waive the fraud and affirm the contract between Abbott and plaintiff, on which Foster was only a surety."

Sixth. "The court erred in rendering its judgment, because the verdict showed that the jury made a mistrial on issues which precluded a judgment."

Seventh. "The failure of the jury to find on the issue of misrepresentations and fraud rendered all the other findings immaterial and insufficient to found a judgment upon."

[1, 2] The first assignment, without discussion, manifestly cannot be considered: If it could be considered in any event, every special issue submitted by the court would have to be improper, and every special issue requested to be submitted by the appellant would have to be good. The requested issues were refused as an entirety.

[3] A part of the second assignment and all of the third are equally improper, and inappropriately urged. Whether considered as assignments or propositions—and they are of the latter nature—they are not sufficient specifications of error, and, as an abstract general presentation, are incorrect. Appellant's authorities to the effect that the trial court cannot look beyond the special verdict to aid the judgment were rendered prior to the adoption of article 1985 in 1897, and now, "upon appeal or writ of error, * * * an issue not submitted and not requested by a party to the cause, shall be deemed as found by the court in such manner as to support the judgment: Provided, there be evidence to sustain such a finding"—which, under appropriate conditions, extends to the trial court the power which appellant denies and would abridge.

The second specification of error in the second assignment, in effect that the judgment was rendered on special issues, not pleaded, will be noticed later.

[4] As to the fourth assignment, complaining generally of the court's failure to submit whether Foster relied upon the representations, likewise complaining of the court's refusal to submit the same issue requested in writing by the defendant, the specific issue was requested, accompanied by a number of other issues, some of which were wholly immaterial as substantive "issues raised by the pleadings and the evidence in the case." Article 1984a. Some are mere submissions for a finding of evidence, and others were substantially embraced within the court's submission. They are also requested as an entirety and rejected as a whole. Hovey v. Sanders, 174 S. W. 1027. Neither are we able to find any exceptions to the court's action in refusing the issues requested. If embraced within Acts 33d Leg. c. 59, exceptions are required. If not so embraced, the general rule as to exceptions to preserve an erroneous action for the appellate court's consideration is necessary. Also see Railway Co. v. Cody, 92 Tex. 632, 51 S. W. 329.

As to the fifth assignment, of course, if the record were such that the judgment was required to be based upon the issue of ratification, and the evidence was not sufficient to sustain such issue, necessarily the judgment could not stand.

[5] The sixth and seventh assignments are cognate, and are presented as propositions, and will be considered. The court submitted the following issue, upon the decision of which the jury were unable to agree:

"Did plaintiffs, or their agent, Fuller, falsely represent the true and real condition of the property of the Seymour Mill, Elevator & Light Company to the defendant Foster, at or prior to the time of the trade in question, as to the amount of indebtedness against said property,

and as to the amount of stock, products, notes, and accounts on hand?"

This was necessarily a material and decisive issue in the case, and should have been found, unless the submission of the following issue, No. 3, with the finding of the jury thereupon, renders the same immaterial:

Third Issue. "Did plaintiffs, or their agent, Fuller, submit to the defendant Foster, for his consideration, before said trade was made on December 31, 1909, a true statement showing the financial condition of said Seymour Mill, Elevator & Light Company, including a statement of all of its indebtedness and the amount of stock, products, notes, and accounts on hand? Answer: Yes; they did."

The court submitted, and the jury also found, the following issue:

"Did the plaintiffs or their agent, Fuller, give the defendant Foster, before and at the time said sale was made, free access and opportunity for him to examine the books of said company, and, if so, did he examine said books? Answer: As to first clause, Yes. As to second clause, No."

There are two statements in this record, one of date November 1, 1909, and another of December 31st, the date the trade was closed, each purporting to reflect, as upon the respective dates, the true condition of the Seymour Mill & Elevator Company as to its resources and liabilities, and their correctness is undenied in this record, except as to overvaluation of some of the property owned by said corporation. These statements, as exhibitions of indebtedness of the corporation, are simple in their presentation, and the testimony of the appellant that he could not have understood the same if he had read them is of no probative strength. Appellant had owned, or had been interested in, several cotton gins, some in the city of Seymour, another in the state of Oklahoma, and another in California. He handled and bought real estate and real estate paper, had been a stockholder in an oil mill, and owned an interest in a steam laundry and in two different national banks. This record exhibits this appellant as having had rather a wide range of business experience, and in trading $3,500 worth of real estate for mill stock which confessed in his pleadings, and established by the finding of the jury, to be worth $8,350 at the time of the trade, indicates generally an intelligence of an understanding quality, notwithstanding his suretyship upon the Abbott notes was a part of the trade. The appellant complains that:

"There was no issue in the pleadings, nor was there any testimony submitted controverting the amount of stock, products, notes, and accounts on hand, * * * nor was there an issue in the pleadings by Foster, or testimony submitted thereon, that he had been deceived as to the amount of stock, products, notes, and accounts on hand."

Appellant probably overlooks his pleading, but if it be true that the testimony does not raise the issue which we are inclined to think is correct, we are only concerned with the alleged false representations as to the debts and the market value of the stock.

As a business man, handling transactions of considerable magnitude, this record is convincing that appellant could have immediately discerned, upon inspection of the "Liability" columns upon either statement, that the liabilities of the mill and elevator company far exceeded and positively contradicted the alleged representations of Fuller as to that matter. The testimony was ample to sustain the finding that the plaintiffs submitted to Foster, before the trade was made on December 31, 1909, a true statement showing the financial condition of the mill company and its personal assets. The testimony is to the effect that he either personally, or in cooperation with the other prospective purchasers, solicited such a statement; and Martin, the bookkeeper, his own witness, on cross-examination first testified positively that appellant offered him such a statement just before the trade for verification from the books, which had been furnished, and then qualified the statement by saying that he did not remember that it was Foster, but that one of the purchasers did offer such a statement for verification. He further said that he remembered they, meaning the purchasers, had the two statements the night when they were discussing this trade.

Appellant himself testified that at the first meeting in early January, immediately following the trade, the board of directors, of which he was one, had under consideration the payment of the mill's obligations. He expressed it in this manner:

"I could not tell you what the main discussion was, but the main thing was trying to meet our obligations."

He said he did not remember whether the board at this time had under consideration statements representing the financial condition of the plant. However, Arthur Powers testified positively that such a statement was at that time presented to the board.

The statements indicated were not only furnished to Foster, but it could be implied and found that he solicited or co-operated in the solicitation from Bennett or his agents the statements. Assuming, argumentatively, that he did not read the same, after having been called for and furnished, we think it is the law that, under the conditions then presented, a party claiming that he has been deceived, who has placed himself upon guard with a desire to ascertain the facts, should not become blind as to the true facts furnished.

"Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when

he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another. 'Volenti non fit injuria' is the maxim in such cases in all courts. And the same reasoning applies when the complaining party does not rely upon the misrepresentations, but seeks from other quarters means of verification of the statements made, and acts upon the information thus obtained." Slaughter v. Gerson, 13 Wall. 383, 20 L. Ed. 628.

Also see Wright v. Bott, 163 S. W. 360; Newman v. Lyman, 165 S. W. 136.

Justice Field used the foregoing language in the Slaughter Case, as applicable to the sale of a boat, the draught of which was claimed to have been falsely represented, and, though the investigation of the purchaser, with his agents, developed his position to that of caveat emptor, however, we conceive that the law has always been that, where a purchaser places himself on guard by soliciting other means of verification of the statements referable to the condition, kind, or quality of the subject-matter of sale, and where the true condition is accessible and patent in the course of the investigation, when begun, the purchaser is not then in a position to say that he blinded himself to the real condition and relied upon the representations. Necessarily, courts are impatient of fraud, and the pervasive moral sense of the community has inspired a judicial attitude exhibited in this state, as well as in other jurisdictions, preventing the guilty party from asserting that another's eyes should have been opened when his influence has been exerted to close them. It is the duty, of course, to square legal principles with the fundamental ethical rules of right and wrong; but the law also recognizes that it is more likely for one disappointed in the expectations of a trade not to blame himself with the cause of his loss, but to blame the act of another.

Pomeroy says:

"If, after a representation of fact, no matter how positive, the party receiving it institutes an inquiry for himself, as recourse to the proper means of obtaining information, and actually learns the real facts, the claim that he relied upon the first statement and was misled by it cannot be admitted, * * * and, if allowed, his defense would furnish a ready means of avoiding all contracts with which a party had become dissatisfied."

After the repetition of this axiom of the law, he further says:

"The same result must plainly follow when, after the representation, the party receiving it has had given to him a sufficient opportunity of examining into the real facts, he is directed to the source of information, and he commences or purports or professes to commence the investigation. The plainest motives and grounds of convenience and expediency demand that, in such circumstances, he must be charged with all the knowledge which he might have obtained had he pursued the inquiry with care and thoroughness to the end. He cannot be heard to allege that he did not learn the truth; he cannot claim to have been misled."

Specific Performance of Contracts (2d Ed.) top page 304, § 220, with notes and annotations.

The same doctrine in the same language is enunciated by Pomeroy, in his Equity Jurisprudence (volume 2, § 893), in connection with note No. 1, on page 1594, third edition. It is probably not necessary to guard this rule by this learned author, in view of the many distinctions disclosed by the decisions of this state and of other states. For example, it seems to be the well-settled principle that, where affirmations of fact are made with reference to the quantity of land, a vendor fraudulently overstates its area, and though the boundaries of the same may be pointed out to the purchaser on examination, however, if the quantity contained within the boundaries is not reasonably capable of estimate upon inspection, and the statements are relied on, the fraud still exists. Again, in this state, in the case of Buchanan v. Burnett, decided by the Supreme Court (102 Tex. 492, 119 S. W. 1141, 132 Am. St. Rep. 900) and the Court of Civil Appeals (52 Tex. Civ. App. 68, 114 S. W. 406), where a vendor made a positive affirmation of title and was furnished an abstract and which the vendee, an unlearned man, assisted by some friend, attempted an examination, the vendee testified that he could not tell anything about the title, and a part of it was unintelligible to him. The abstract exhibited a defective title, but under the status of case presented, the vendee relying upon the representation made he was entitled to rescind. 102 Tex. 492, 119 S. W. 1141, 132 Am. St. Rep. 900. In that cause the information was, of course, available in a sense, not to the purchaser directly, but to one of sufficiently expert knowledge to whom the purchaser might have presented the abstract for examination. This is the nearest case to the present record which has been cited or we have been able to find decided by the courts of this state. The analogy is only apparent. Here the appellant, or those co-operating with him, demand a statement. The same is furnished, presenting the true condition of the corporation. To a purchaser the liabilities are apparent. One witness testified that the statement was taken by the purchasers into another room at a period of the negotiations while the trade was under discussion. The appellant says he did not read it, and if he had he would not have understood it. Pomeroy, in both text-books, under the sections cited, presents the case of Lowndes v. Lane, 2 Cox, 363, which is an English case, not accessible to this court. He summarizes it as follows:

"A purchaser had bought property, consisting partly of woods, upon the representation that they had yielded from timber cut and sold from them, £250 a year, on the average for 15 years. He claimed that this representation was practically false and really misleading, not because the woods had not, in fact, yielded that sum, but because they had not been used in a proper manner, and according to ordinary fair husbandry, and, if so used, they would not have produced nearly so much. This objection would probably be fatal in England, where woodland

is exceedingly valuable, and where the mode of using it is guided by many strict rules of practice and of law; but, as a fact, before concluding the contract, a paper was delivered to the purchaser and kept in his possession which, if examined, would have shown him conclusively that the woods had not been used in this ordinary manner, but that the timber had been unequally and extravagantly cut. He was held chargeable with the knowledge which he might and ought to have obtained, and so was not misled."

This quotation is taken from note 1, Specific Performance of Contracts (2d Ed.), under section 220; also noted and cited under section 893, in his work on Equity Jurisprudence, above mentioned. We conceive, of course, that a party could deliver a statement which the purchaser could assume as being in conformity with the representations made and would not have to examine it, relying upon the representations, nor would the lack of examination avail the person guilty of the fraud.

If the above conception of the law, as applied to the facts, and to the finding of the jury as to the true statement furnished as to liabilities, is correct, it is decisive of the case; and the failure of the jury to find on the issue of the alleged representations as to the debts of the Seymour Mill & Elevator Company is wholly immaterial.

[6] The trial court submitted the following special issue, answered by the jury as indicated:

"(1) Did the plaintiffs or their agent, Fuller, represent to the defendant Foster at or prior to the time when said trade was made, December 31, 1909, that $1.14 was the book value or market value of said stock in Seymour Elevator & Light Company?"

To which the jury answered: "Book value."

In the condition of this record, the appellant has no just cause for complaint of the manner of the submission of this issue on the ground that it was the submission of an issue not embraced within his pleadings. Foster testified that Fuller represented the market value of this stock at $1.14. Assuming that the alleged statement as to the market value is an affirmation of a fact, and not opinionative, Fuller specifically denied any such representation, but admitted that he stated the book value was $1.14. At the time of the trade, according to the manner of bookkeeping, this statement as to book value was true. This testimony rather assumed the condition of a conflict between a representation as to book value and market value of the stock—whether Foster made the one or the other statement. As applied to the testimony, an appellate court could consider the submission and the finding of the jury as to book value; that such finding negatived the alleged statement as to market value. Of course, it may have been more proper to have presented a definite submission whether the alleged representations as to market value had been made. However, the court's method of the presentation of the issue, without any special issue requested properly presented to this court as to sustain any compaint against the action of the court, precludes any error.

We think, upon the whole, this judgment should be affirmed.

Affirmed.