[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Res Gestæ.]

3. CRIMINAL LAW ⟨⟩1169(6) — APPEAL — HARMLESS ERROR—EVIDENCE.

Where the lowest punishment was assessed against defendant, if the testimony was not res gestæ, and erroneously admitted, its admission was not error justifying reversal.

4. CRIMINAL LAW ⟨⟩829(1)—TRIAL—INSTRUCTIONS—REPETITION.

It was not error to refuse to give again substantially, at defendant's request, a charge already covered by the court's charge.

Appeal from Lamar County Court; Tom L. Beauchamp, Judge.

Earl McHam was convicted of a simple assault, and he appeals. Judgment affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted of a simple assault, and the lowest fine assessed against him.

[1] The testimony of the state is positive and clear, establishing the offense charged; that of the appellant and his witnesses, if believed, would have shown that he was not guilty. This was a question of fact for the jury, and not for this court.

[2] Appellant has two very meager bills to a question asked and an answer given, which, under the rules, are so defective as to preclude their consideration; however, considering them, neither shows any reversible error. In one, he objected to the county attorney asking a witness if Earl Humphrey cursed or abused him before they began fighting, and he answered, "Yes;" that he called him "a thick-lip son of a bitch." In the other, he objected to this question to a witness: "While you were were holding the defendant, did he curse you?" and he answered, "Yes; he called me a son of a bitch." To the bill complaining of the first, the court, in approving it, explained that a witness had testified he heard "defendant tell Humphrey to get Haley (the assaulted party) out of the house, thus connecting him as a vice principal, if true." All of this testimony was clearly res gestæ of the transaction. The testimony was sufficient to show that just before the prosecuting witness, Haley, and Humphrey began fighting, Humphrey called Haley a thick-lip son of a bitch, which seemed to have at once caused a fight between them; that just before this defendant told Humphrey to get Haley out of the house, and as soon as Haley and Humphrey began to fight appellant ran up and himself struck Haley on the side of his face a hard lick, and knocked him to one side, which constituted the offense in this case. Shelton then grabbed defendant and held him until the fight was over. It was as Shelton grabbed and

held him, and because thereof, appellant then called Shelton a damned son of a bitch. Judge White, in his Annotated P. C. § 1236, correctly says res gestæ are the facts and circumstances immediately hovering around and directly connected with the transaction, occurring at the time and place of the main fact, and that all which was said or done, or that which occurred at the time of the alleged offense, tending in the slightest degree to explain the transaction or conduct or motives of the parties, is admissible. These statements were clearly res gestæ. Muldrew v. State, 73 Tex. Cr. R. 469, 166 S. W. 156, and cases cited.

[3] As stated, the lowest punishment was assessed against appellant, and if it could be held that either of said items of testimony objected to by appellant was not res gestæ, and erroneously admitted, the admission of either or both would be such error as to justify a reversal.

[4] The only other objection was to the refusal of a special requested charge by appellant. The court correctly refused this, for the reason stated, that it was sufficiently embraced in the court's main charge. This was true, and it, of course, was no error to refuse again to give substantially a charge that was already covered by the court's charge.

The judgment is affirmed.

---

GULF COAST TRANSP. CO. v. STANDARD MILLING CO. et al.   (No. 241.)

(Court of Civil Appeals of Texas.  Beaumont. June 29, 1917.  On Motion for Rehearing, Oct. 17, 1917.)

1. APPEAL AND ERROR ⟨⟩501(4) — BILL OF EXCEPTIONS—SUFFICIENCY.

Where the requests for special instructions were on three separate pieces of paper, a bill of exceptions disclosing but a single exception to a single action of the court was insufficient, in view of Acts 33d Leg. c. 59, requiring that errors in giving or refusing special instructions must be excepted to below to be available on appeal, and that, in the absence of an affirmative showing in the record, an exception will not and cannot be presumed to have been taken.

2. CARRIERS ⟨⟩133—INJURY TO GOODS—EVIDENCE ADMISSIBLE.

In an action to recover for one half of a rice crop alleged to have been damaged in transit, testimony of an expert as to the condition at its destination of the other half shipped over the same route was inadmissible, where the proof failed to follow, such rice in transit, to show that it was handled similarly to that in controversy, as proof of damage to one lot would not afford a basis for an opinion as to the cause underlying the damage to the other.

3. TRIAL ⟨⟩260(7) — REQUESTED INSTRUCTIONS—INSTRUCTIONS ALREADY GIVEN.

Where the court's general charge fairly submitted defendant carrier's theory that the damage to rice was caused by the initial wetting at the time of threshing, defendant's requested special instruction embodying such theory was properly refused.

4. CARRIERS ☞133 — DAMAGE TO GOODS —
CUSTOM—EVIDENCE.
Where the manner of loading the rice alleged
to have been damaged in transit was shown by
positive testimony, testimony as to the manner
in which rice was usually loaded was immate-
rial, and properly excluded.

On Motion for Rehearing.
5. JUDGES ☞47(1)—DISQUALIFICATION—AT-
TORNEY FOR PARTY.
In an action to recover for rice damaged in
transit, that two of the justices of this court
were connected with appellant's codefendant, a
connecting carrier, as attorneys, in a local ca-
pacity, would not disqualify them, where they
knew nothing of the existence of the suit until
it was filed in this court.

Appeal from District Court, Harris Coun-
ty; W. J. Howard, Special Judge.

Action by the Standard Milling Company
against the Gulf Coast Transportation Com-
pany and another. Judgment for plaintiff
against defendant named, and it appeals.
Affirmed.

Stevens & Stevens, of Houston, for appel-
lant. Baker, Botts, Parker & Garwood and
Andrews, Streetman, Burns & Logue, all of
Houston, for appellees.

BROOKE, J. This suit was instituted in
the district court of Harris county by the
Standard Milling Company, plaintiff, against
the Texas & New Orleans Railroad Company
and the Gulf Coast Transportation Company
as defendants. The defendants were sued as
common carriers. The plaintiff alleged in its
petition that on the 1st day of March, 1911,
the old River Rice & Irrigation Company, the
agent of the plaintiff, delivered to the Gulf
Coast Transportation Company 794 sacks of
rough rice, the same being the property of
the plaintiff, and on the 6th day of March,
1911, its said agent delivered to said Gulf
Coast Transportation Company another lot of
826 sacks of rough rice, the property of the
plaintiff; both of said lots of rice being de-
livered at Cove, Tex., for transportation and
delivery to the plaintiff in the city of Hous-
ton, Tex. It was further alleged that all of
said rice, when delivered to said Gulf Coast
Transportation Company, was sound and in
good condition, but that during the time
when said rice was in course of transporta-
tion, and while same was in possession of de-
fendants, the defendant Texas & New Or-
leans Railroad Company being a connecting
carrier of the Gulf Coast Transportation
Company, the same was damaged and injur-
ed, and was greatly reduced and depreciated
in value, by reason of the same becoming
wet. Plaintiff sought to recover damages;
the same being the alleged depreciated value
of said rice, with legal interest thereon from
the date of its shipment.

The defendant Texas & New Orleans Rail-
road Company answered, by denying plain-
tiff's allegation as to the injury to said rice,
and alleging that the said Texas & New Or-

leans Railroad Company only undertook to
transport the rice in controversy from Clin-
ton, Tex., to Houston, Tex., Clinton being the
point at which it received the same from its
connecting carrier, the Gulf Coast Transpor-
tation Company, and further alleging that no
damage occurred upon its line, and that, if
the rice had been damaged in transit, such
damages arose during the time the same
was being transported and handled by its co-
defendant, the Gulf Coast Transportation
Company. The Gulf Coast Transportation
Company admitted receiving the rice in con-
troversy at Cove, Tex., for shipment to its
connecting carrier at Clinton, Tex., but spe-
cially denied that the rice was injured dur-
ing the time that the same was in the cus-
tody of the said Gulf Coast Transportation
Company.

In a general way, the Milling Company's
proof tended to show that when the rice in
controversy was delivered to the Transporta-
tion Company for shipment, it was sound and
in good condition; that the barges on which
it was shipped laid at anchor for a week or
two, without caretakers; that the canvas tar-
paulins used by the Transportation Company
to protect the rice were old and imperfect;
that the rice was loaded on the decks of the
barges, without other covering than tarpau-
lins, and was raised above the deck only by
a framework of one-inch boards laid across
2x4's; that, in towing the barges across Gal-
veston Bay, the captain of the tug tied the
barges so that one would throw spray on the
other; that the barges were so loaded that
the decks were only 12 or 16 inches above
the water line, and that the barges were
loaded so deeply that ordinary waves would
break against the sides, and throw spray over
the deck load. It further attempted to show
that, on arrival of the rice at destination, it
had been severely and recently damaged by
water. The undisputed proof showed that
the Railroad Company loaded the rice into
waterproof cars at Clinton, where it was de-
livered by the Transportation Company, and
handled it promptly to destination.

The case was submitted to the jury upon
special issues. Upon the issues found by the
jury, a judgment was entered in favor of the
plaintiff and against the Gulf Coast Trans-
portation Company in the sum of $1,795.68.
The jury, in accordance with the instruction
from the court, returned a verdict in favor
of the defendant Texas & New Orleans Rail-
road Company. The Gulf Coast Transporta-
tion Company presented its motion for a new
trial, which was overruled by the court, and
the case has been appealed to this court.

[1] Before we consider appellant's assign-
ments of error, we are confronted with a
motion with reference to appellant's bill of
exceptions No. 3, and to not consider the
same, because the same does not show that
the only exception taken by appellant to the

refusal of its special instructions Nos. 1, 2, and 3 was a single exception to the action of the court in refusing all three of said instructions, and said bill failing to show that an exception was taken to the action of the court in refusing each of said instructions, and the court having rightfully refused each of said instructions, that such refusal must be considered, under the statute, as acquiesced in. The bill of exceptions has been brought to this court. The said exceptions are on separate pieces of paper, and the following is a copy of said exceptions:

"Now comes the defendant Gulf Coast Transportation Company, in the above styled and numbered cause, and requests the court to give in charge to the jury the following: Gentlemen of the Jury: If you believe from the evidence that the shipment of rice was not in as good condition when it was delivered to the Gulf Coast Transportation Company by the plaintiff as it was when it was received by the plaintiff from the Texas & New Orleans Railroad Company at Houston, and that the difference in the condition of the same, or damage to the same, arose by reason of the fact that the rice had been threshed when it was wet, you will find for the defendant Gulf Coast Transportation Company.

"Special Charge No. 1, Requested by Stevens & Stevens, A. W. Marshall, Attorneys for Defendant Gulf Coast Transportation Company.

"Refused. W. J. Howard, Judge Presiding."

Indorsements on back:

"No. 62,370. Standard Milling Company v. Texas & New Orleans Railroad Company et al. Special Charge No. 1, Requested by Defendant Gulf Coast Transportation Company. Filed March 1st, 1916. O. M. Duclos, Clerk District Court, Harris County, Texas, by Sol Z. Gordon, Deputy."

The second piece of paper shows:

"Now comes the defendant Gulf Coast Transportation Company, in the above styled and numbered cause, and requests the court to give in charge to the jury the following: Gentlemen of the Jury: If you find from the evidence that the rice was in a more damaged condition at the time it was delivered at Houston than it was when delivered by the plaintiff to the defendant Gulf Coast Transportation Company, but that said damage arose from deterioration on account of the said rice having become wet or damp before it was delivered to said company, then you will find for the defendant Gulf Coast Transportation Company.

"Special Charge No. 2, Requested by Stevens & Stevens, A. W. Marshall, Attorneys for Defendant Gulf Coast Transportation Company.

"Refused. W. J. Howard, Judge Presiding."

Indorsements on back:

"No. 62370. Standard Milling Company v. Texas & New Orleans Railroad Company et al. Special Charge No. 2, Requested by Defendant Gulf Coast Transportation Company. Filed March 1st, 1916. O. M. Duclos, District Clerk, Harris County, Texas, by Sol Z. Gordon, Deputy."

The third piece of paper shows:

"Now comes the defendant Gulf Coast Transportation Company, in the above styled and numbered cause, and requests the court to give in charge to the jury the following: Gentlemen of the Jury: If you find from the evidence that the rice, at the time it was delivered to the plaintiff at Houston, was not in as good a condition as when it was delivered to the Gulf Coast Transportation Company, but that on account of said rice having been wet or damp at the time it was threshed, and the subsequent placing of the same in the closed box cars of the T. & N. O. Railroad at Clinton, caused the previous damage to said rice to develop, you will find for the defendant Gulf Coast Transportation Company.

"Special Charge No. 3, Requested by Stevens & Stevens, A. W. Marshall, Attorneys for Defendant Gulf Coast Transportation Company.

"Refused. W. J. Howard, Judge Presiding."

Indorsements on back:

"No. 62,370. Standard Milling Company v. Texas & New Orleans Railroad Company et al. Special Charge No. 3, Requested by Defendant Gulf Coast Transportation Company. Filed March 1st, 1916. O. M. Duclos, Clerk District Court, Harris County, Texas, by Sol Z. Gordon, Deputy."

The bill of exceptions is as follows:

"Be it remembered that on the trial of the above styled and numbered cause, after the court had submitted to the attorneys of the respective parties for their inspection its general charge, and before the same was read to the jury, and before the argument was begun in said cause, the defendant Gulf Coast Transportation Company requested the court to give its special charge No. 1, as follows, to wit: 'If you believe from the evidence that the shipment of rice was not in as good a condition when it was delivered to the Gulf Coast Transportation Company by the plaintiff as it was when it was received by the plaintiff from the Texas & New Orleans Railroad Company at Houston, and that the difference in the condition of the same, or damage to the same, arose by reason of the fact that the rice had been threshed when it was wet, you will find for the defendant Gulf Coast Transportation Company.' And also requested the court to give its special instruction No. 2, as follows, to wit: 'If you find from the evidence that the rice was in a more damaged condition at the time it was delivered at Houston than it was when delivered by the plaintiff to the defendant Gulf Coast Transportation Company, but that said damage arose from deterioration on account of the said rice having become wet or damp before it was delivered to said company, then you will find for the defendant Gulf Coast Transportation Company.' And also its special instruction No. 3, as follows, to wit: 'If you find from the evidence that the rice, at the time it was delivered to the plaintiff at Houston, was not in as good a condition as when it was delivered to the Gulf Coast Transportation Company, but that on account of said rice having been wet or damp at the time it was threshed, and the subsequent placing of the same in the closed box cars of the T. & N. O. Railroad at Clinton, caused the previous damage to said rice to develop, you will find for the defendant Gulf Coast Transportation Company'—which aforesaid requested special instructions of the defendant Gulf Coast Transportation Company, Nos. 1, 2, and 3, were refused by the court, to which action of the court the defendant Gulf Coast Transportation Company in open court then and there excepted, all of which proceedings were had before the giving of the court's general charge to the jury, to which action of the court, in refusing to give said special instructions of the defendant Gulf Coast Transportation Company, said defendant in open court excepted, and here now tenders this as its bill of exception, and asks that the same be approved and ordered filed as a part of the record in said cause. [Signed] A. W. Marshall, Stevens & Stevens, Attorneys for Defendant Gulf Coast Transportation Company.

"The foregoing bill of exception examined by me, and the same is accordingly approved and ordered filed as a part of the record in said cause. W. J. Howard, Special Judge of the 61st Judicial District Court of Harris County, Texas."

It is urged that the bill of exception discloses plainly that the three special requested charges were presented to the court as one request, and that it is perfectly clear that the only exception taken by appellant to the refusal of its charges was to the action of the court in refusing all three of them. We have gone into this matter quite at length, because the power of this court to revise the action of the trial court in the refusal of special instructions, it is strenuously urged, is limited to those rulings of the trial court which were excepted to at proper time, and then only in case the record affirmatively shows the nature of the exceptions and the fact that same was taken, and it is further urged that this can only be evidenced by a bill of exception.

In Railway Co. v. Dickey, 187 S. W. 184, the Supreme Court had under consideration the question whether certain objections to the court's main charge were so disclosed by the record as to permit the revision of the charge for error. In discussing chapter 59 of the Acts of the Thirty-Third Legislature, it stated that the act plainly differentiated between exceptions to the court's main charge and exceptions based upon the giving and refusing of special charges. In discussing the question the Chief Justice said:

"Article 1974, under the amendatory act, reads: 'When the instructions asked, or some of them, are refused, the judge shall note distinctly which of them he has given and which he refused, and shall subscribe his name thereto, and such instruction shall be filed with the clerk and shall constitute a part of the record of the cause, subject to revision for error.' The change in article 1974 effected by the amendatory act is to omit the concluding clause of the original article, following the phrase, 'subject to revision for error,' namely, 'without the necessity of taking any bill of exception thereto.' This indicates, plainly, an intention to make an important change in the law with respect to the subject of taking bills of exception to special charges in order to obtain their review on appeal. It reveals very clearly, we think, a purpose to hereafter require the reserving of a bill of exception to the action of the court on special instructions as necessary to its revision on appeal."

The Ft. Worth court, in Insurance Co. v. Walker, 187 S. W. 1036, said:

"This court, and most, if not all, of the other Courts of Civil Appeals, have held, in accordance with the provisions of the act approved March 29, 1913, * * * that to be available on appeal it must appear that specific exception was made to the action of the court in refusing a special instruction. See Mutual Life Ins. Ass'n v. Rhoderick, 164 S. W. 1067; Heath v. Huffhines, 168 S. W. 974; St. L. & S. W. Ry. Co. v. Wadsack, 166 S. W. 42; T. & P. Ry. Co. v. Tomlinson, 169 S. W. 217; Cleburne Street Ry. Co. v. Barnes, 168 S. W. 991; Elser v. Putnam Land & Development Co., 171 S. W. 1052; Bohn v. Burton Lingo Co., 175 S. W. 173; King v. Gray, 175 S. W. 763. Not only so, but this court has further held that the spirit of the enactment referred to and of our laws relating to bills of exception require that the excepting party should set forth in his bill of exception the specific reasons therefor to the end that the trial court may be properly informed and have presented an opportunity to correct the error, if one was thus made to appear."

In the case of Insurance Ass'n v. Rhoderick, 164 S. W. 1067, the Amarillo court said:

"'The ruling of the court in the giving, refusing, or qualifying of instructions to the jury shall be regarded as approved unless excepted to as provided for in the foregoing articles.' Rev. St. 1911. art. 2061, as amended by Acts 33d Leg. (Sess. Laws, p. 114). There are no exceptions whatever in this record shown to have been made by the appellant on account of the refusal by the trial court of any special instructions, and hence such action of the trial court, under the statute, is regarded as approved, on account of the failure of such exceptions."

In Heath v. Huffhines, 168 S. W. 974, the Ft. Worth court, quoting from their earlier decision in Taylor v. Butler, 168 S. W. 1004, said:

"Where the complaint is, as here, of the action of the court in refusing a special instruction, exception to the refusal must be made at the time, and the exception made part of the record by a proper bill of exception."

In Railway Co. v. Wadsack, 166 S. W. 42, the Texarkana court used the following language:

"It was the manifest purpose of the Legislature, in adopting these different amendments, to so reform the practice in our judicial procedure as to reduce the number of reversals on appeal for purely technical errors. Heretofore the rulings of the court in giving and refusing charges was regarded as excepted to in every instance, without any express reservations by bill or otherwise. The effect of the amendment to article 2061 is to place the rulings of the court in giving or refusing charges in the same category with other rulings not appearing of record as to the formalities required for their consideration on appeal. Appellate courts can now no more review the action of the trial court in giving or refusing charges than they can the rulings admitting or excluding testimony, without proper bills of exception. It also follows that bills of exception relating to the giving or refusing of charges must conform to the requirements provided by statute for bills of exception generally."

In the case of Bohn v. Burton-Lingo Co., 175 S. W. 173, the El Paso court uses this language:

"Various assignments complain of the peremptory instruction in favor of appellee and of the refusal of instructions requested by appellants. They are overruled for the reason that no exception appears to have been taken, as required by chapter 59, Acts 33d Leg. In order to avail one of the right to complain of errors relating to such matters, the record must affirmatively show that the provisions of the act mentioned have been observed. And it has been held by this and other courts that the act is applicable to peremptory instructions given or refused."

In the case of Pearce v. Supreme Lodge, 190 S. W. 1156, the same rule was announced.

In Railway v. Bland, 181 S. W. 504, the Austin court uses this language:

"This court, and most of the other Courts of Civil Appeals, have construed that act, and held that, since it became the law, objections cannot be urged on appeal to the action of the trial court in giving or refusing instructions to the jury, unless the record shows that the complaining litigant excepted to such action of the trial court. The rulings referred to have caused dissatisfaction; and, inasmuch as able counsel for appellant in this case are, in effect, insisting upon a different ruling, we have reconsidered the question, with the result that no reason has been found for changing the conclusions heretofore reached."

It seems, therefore, that the almost unanimous construction, which has been placed, not only by our Supreme Court, but by the Courts of Civil Appeals, upon the practice amendment of 1913, requires that errors of the trial court in the giving and refusing of special instructions be available for reversal on appeal only when excepted to below, and, in the absence of an affirmative showing in the record, an exception will not and cannot be presumed to have been taken. The special charges requested by appellant were, as heretofore set out, written on separate sheets of paper, and the word "Refused" was indorsed by the special judge, and signed by him on each of the charges so requested. On appeal, this court must presume that no other, further, or additional exception was taken, for it can no more enlarge a bill of exceptions, which is in the record, than it can supply one, which is not shown to have been reserved. The statute affirmatively says that the errors of the trial court in this behalf, except in so far as they may be excepted to, shall be considered waived. The fact that the charges are indorsed "Refused" throws no light whatever upon the question of any exception to the refusal. That discloses that there has been an action or ruling of the district court, which might have been the subject of an exception, had the same been made in proper time. The only evidence of the exception actually taken is the bill of exception, by means of which the appellant carries into the record an affirmative showing that he did not consent to and waive the error claimed. The bill of exception in the record evidences it to be a single exception to a single action of the court; that action being the court's refusal to give the three special charges referred to in the bill. The vital point is not the fact of request, and not the fact of refusal, but the fact of exception to the refusal. The statutes of this state provide a plain and adequate method for incorporating in the record the exceptions taken on the trial. They require that the record disclose affirmatively that counsel did not acquiesce in the ruling of the court on special charges before such ruling can be made the basis of reversal on appeal. It is not competent for an appellate court to presume that objection to the admission or exclusion of evidence was made other than as shown by bill of exception; neither will the court presume or look outside of the bill of exception for evidence of an exception to the refusal of a special charge, which is not shown by the bill itself. In our opinion, the objection to the bill of exception, heretofore set out fully, is well taken.

In the case of Hovey v. Sanders, 174 S. W. 1025, 17 special issues were requested by the defendant. Of these, the court gave 6, and refused the others. The bill of exception was as follows: That defendant duly excepted to the action of the court in refusing said issues. The court said:

"It is further contended that a 'general wholesale exception' to the court's refusal to give several distinct charges or instructions is not entitled to consideration on appeal if any one of the charges requested is erroneous, and not entitled to be given. * * * It seems that our present practice with reference to excepting to the court's charge and to the refusal of special charges is practically identical with that followed in the federal court and in several of the state courts."

In Railway v. Callaghan, 161 U. S. 91, 16 Sup. Ct. 493, 40 L. Ed. 628, the court said:

"Again, it is firmly established that, where propositions submitted to a jury are excepted to, en masse, the exception will be overruled, provided that any of the propositions be correct; and where a general exception is taken to the refusal of a series of instructions, it will not be considered, if any one of the propositions is unsound."

In the case of Foster v. Bennett, 178 S. W. 1001, the assignment of error was as follows:

"The court erred in giving its special issues to the jury, and in refusing to give those requested by defendant, as shown in defendant's bill of exceptions Nos. 3 and 4."

The court said:

"The first assignment [of error], without discussion manifestly cannot be considered. If it could be considered in any event, every special issue submitted by the * * * appellant would have to be good. The requested issues were refused as an entirety."

It is urged in this case that the exception taken to two of the charges refused was improper, and that for this additional reason the bill should not be considered. This additional reason why it should not be considered will be taken up in the opinion and the further discussion of the case. The objection of appellee is well taken.

The first assignment embraces the first, second, and third grounds in appellant's motion for new trial, they being grouped, and the assignment is as follows:

(1) "The evidence having shown that the rice upon which the plaintiff seeks to recover damages consisted of one-half of the rice crops of Haywood and Gillard, or of Gillard and Haywood, and of Williams, which was raised on the canal of the Old River Rice & Irrigation Company during the year 1910; and the evidence having further shown that the other one-half of said crops raised by said parties as aforesaid was delivered to said Old River Rice & Irrigation Company and was received by said company as its one-half of said crop for the lease of the land and water rent, the said Haywood and Gillard and the said Williams having been the tenants of said Old River Rice & Irrigation Company upon its canal during the year 1910; and the evidence having further shown that the entire crops of said rice, constituting the respective halves owned by the said tenants and the said Old River Rice & Irrigation Company, was threshed under unfavorable weather conditions and during a rainy season, and that the same became more or less wet during the threshing of said entire crops constituting the said halves of the same as aforesaid; and the evidence having further shown, on the part of the defendant Gulf Coast Transportation Company, that the one-half of said respective crops of rice so delivered to it as aforesaid by said tenants was received by it and handled and kept in the same warehouse, and that the same two months after the shipping of the rice in controversy was shipped to the Pritchard Rice Milling Company or the Southern Rice

Growers' Association at Houston, Tex., and that the said one-half of said rice crops received as aforesaid by the said Old River Rice & Irrigation Company, as its share of said crops, by said tenants, was the same in kind as the one-half of said crops which was subsequently sold to the plaintiff; and the evidence having further shown that when said rice of said Old River Rice & Irrigation Company was delivered, two months after the shipment of the rice in controversy at Houston, Tex., to the Pritchard Rice Milling Company, or the Southern Rice Growers' Association by the witness L. B. Gano, an expert witness in this regard, that said one-half of said rice crops of Haywood and Gillard, and the Williams rice so shipped and owned by said Old River Rice & Irrigation Company, was damaged and bore evidence that it had been wet at the time of threshing—whereupon the defendant Gulf Coast Transportation Company offered to prove by said L. B. Gano, an expert witness in the rice business, and experienced as a rice grader and rice buyer, that about two months after the rice in controversy was shipped he examined what was known as the Williams rice for the Old River Rice & Irrigation Company, and that he graded the same into 2's and X's; that this was about during the month of April or May, 1911, and that said one-half of said Williams rice, so owned by said Old River Rice & Irrigation Company, showed 380 sacks graded as 2's and 144 sacks graded as X's, and that graded as 2's was classed as No. 2, and that graded as X's was damaged or musty rice; that there was no distinction or difference in rice which had become recently wet and that which was remotely wet, and that you could hardly tell the difference, because they are both musty and damaged, and that rice which was shipped between the 1st and 6th of March, and loaded between the 1st and 6th of March, and arrived in Houston about the 18th of March, at a period of from 10 to 16 days from the time of its initial shipment, and had become wet during said period of from 10 to 16 days, would not have shown the same condition that this Williams part of said crop did, which had been sampled by said witness, and that if it had gotten wet on the barges it would have been wet in spots, whereas, if it had been wet before its shipment, it would have been wet through and through, and that the discoloration of the hull would not be the same under a recent wetting as it would be after it had been laying around for months, and that you can usually tell the difference in classing rice as to whether the damage to it is remote or late damage, which testimony was objected to by the plaintiff, for the reason that it was shown that the Williams rice and the Haywood and Gillard rice, and all rice in that vicinity, was harvested and threshed under varying conditions, and because the conditions at the time of grading the rice by Mr. L. B. Gano were the same, which objection on the part of the plaintiff was sustained by the court, and the said defendant Gulf Coast Transportation Company was not permitted to adduce said proof with respect to his examination and grading of said rice known as said Williams rice. And thereupon said defendant Gulf Coast Transportation Company stated that it desired to offer said proof as a circumstance for the purpose of showing that the rice, about which plaintiff complains, was really damaged on account of having become wet when the same was threshed; hence the court erred in declining to permit the said evidence of the said witness Gano to be introduced before the jury, all of which is fully shown by the bill of exception of the defendant Gulf Coast Transportation Company. This excluded evidence became pertinent, because the evidence had shown that, if rice was placed in a warehouse in a damp condition, the longer it so remained the more it would be damaged."

(2) "The court erred in excluding the testimony of the witness L. B. Gano, offered on the part of defendant for the purpose of showing that the one-half of the Williams rice crop, which was delivered to the Old River Rice & Irrigation Company, was damaged because the same was threshed when it was wet, and in refusing to permit said witness to show the grades of said half of said crop delivered to said Old River Rice & Irrigation Company as a circumstance in order to refute the proof of the plaintiff that its part of said rice crop was damaged in transit upon the barges of the defendant Gulf Coast Transportation Company."

(3) "The court erred to the prejudice of this defendant in not permitting it to prove the grade of the part of the crop of rice raised by Williams, which was delivered to the Old River Rice & Irrigation Company, which was threshed under the same unfavorable conditions as the rice owned by the plaintiff and was originally damaged at the time of its threshing in the same manner; such testimony showing that the said part of said Williams crop so delivered to said Old River Rice & Irrigation Company bore evidence, during the months of April or May, 1911, of having been damaged, because it was wet when threshed during the months of September and October, 1910, such testimony also showing that the part of said crop of rice purchased by the plaintiff was damaged in the same way and was graded as No. 2 and X, which was the same grades as said Williams rice owned by said Old River Rice & Irrigation Company."

The proposition made under the first assignment is that circumstantial evidence which, while not directly establishing the fact sought to be proven, establishes other facts from which the existence of the disputed fact may be with more or less probability inferred, is admissible. On the other hand, it is contended that the action of the district court in excluding the testimony of the Transportation Company's witness Gano was not erroneous, because the proof showed that the rice in controversy, as well as the rice examined and graded by Gano was threshed under varying conditions of weather, and that there was no uniformity in the manner of handling and storing any of said rice after it was threshed; furthermore, the proof wholly failed to show either (a) the actual condition of the rice graded by Gano before it was shipped to Houston, or (b) that the conditions under which the rice graded by Gano was shipped to Houston were similar to those under which the rice in controversy was shipped to Houston. The testimony offered was therefore remote, irrelevant, and immaterial, tended to prove no relevent fact, but only tended to create a surmise or suspicion as to the cause of the damage to the rice in controversy, upon which the jury would have had no right to act.

In order that a clear conception may be had of the point raised, it will be necessary, perhaps, to quote briefly the testimony of the witnesses of appellant.

J. E. Hatmaker testified:

"I am working for the Old River Rice & Irrigation Company at Cedar Bayou. I have worked for them altogether about 10 years. During the fall of 1910 I was at Old River— at Cove, Tex., with the same company. At that time I was warehouseman at warehouse

No. 3, on Old river, at Cove. I was the manager of the warehouse there. I had charge of all the stacking and storing of rice that was hauled there to be stored in the warehouse. I made out the warehouse receipts and warehouse reports. I can refresh my memory from warehouse reports made me during October, 1910, as to rice received as the Gillard rice. On September 9, 1910, I received, at warehouse No. 3, 16 sacks of the Gillard rice. The condition of that rice as reported to me was that it was wet. This is my name signed to this warehouse report as warehouse man. On September 10th I received 27 sacks of Gillard rice, which was wet; on September 11th I received 32 sacks of the Gillard rice, which was wet; and on September 12th I received 68 sacks, wet. That rice was all placed in the warehouse. My reports show that I also received dry rice at various times during that period, or rice which was in good condition. I could not tell you offhanded how many sacks of dry rice I received; but I said I had received dry rice during that time, but I could not say that I have any independent recollection of the particular dates. I received dry rice from Gillard during that year; I am sure of that. I have no recollection of how many dry sacks of rice I received. I could not say that the rice I mentioned was all of the wet rice I received from Gillard. The water was not running out of the sacks of this wet rice when it came into the warehouse; it wasn't that wet. But the rice was wet; the sacks were wet. I put a trier into the sacks to find out whether the rice on the inside was wet. When it went into the warehouse, I examined the rice to see if it was wet; I examined it with a trier; I examined each sack that way. I am sure that I did that. I would not come right out and swear that I sampled every sack of that rice. I have no independent recollection of the matter, except what is shown on these reports that I made. That rice which I have noted in the report as being wet was pretty wet. I don't remember how that rice was handled when it came into the warehouse, or how it was stacked; I could not say exactly how we placed it in the warehouse. I don't remember whether we had room enough in the warehouse to put each sack out in a separate place, where it would be well ventilated. I can't remember how I placed each sack of that rice. I could not say whether I stacked it up, one sack on top of another, all in one place, or whether I strewed the sacks around the warehouse, so that no two sacks would be piled one on top of the other. If the rice was wet when it came into the warehouse, and I had the room, I would strew the rice around in the warehouse to give it ventilation. I don't remember whether I had room enough to do that with this particular rice or not. I just know that I received this rice into the warehouse; I don't know where in the warehouse it was put, or how it was put in there. Besides myself, Jim Scott received rice there as warehouse man. Mr. Scott is dead; I think he has been dead about three years. If the rice was in good condition, and didn't appear to be wet, I wouldn't make any memoranda on the warehouse report at all. I received other lots of Gillard rice while I was acting as warehouse man. On September 7th I received 48 sacks of dry rice from him; on September 8th I received 74 sacks, dry. That is all I have on these reports bearing my signature. I wasn't there when that rice was loaded on the barges. I have no recollection as to how this particular rice was loaded, but I have seen how rice is generally loaded there. The warehouse man, as a general thing, superintended the loading of that rice, and I was the warehouse man up until October 3d. After that Mr. Scott attended to the duties of the warehouse man. I could only testify as to what occurred up to October 3,

1910. Mr. Scott succeeded me, and he is now dead."

J. C. Fowler testified:

"In the fall of 1910 I was living at Cove, Tex., on the Old River Rice & Irrigation Company's canal. I raised rice there that year. I know where the land that was farmed by Haywood and Gillard and C. O. Williams was. I was farming land there that year. You might say that Haywood and Gillard and C. O. Williams were farming all around me. My land was in a body straight through, and they was on the right and left hand sides; that is, Haywood and Gillard was east, and Williams was to the west. The farms of Haywood and Gillard adjoined me, but Williams' didn't exactly adjoin; he was west of me about a half a mile. There was just a levee between Haywood and Gillard and my place. I am pretty familiar with the weather conditions during the harvesting season of 1910 down there; the weather was pretty bad, if I recollect it, all through the cutting season and the threshing. By bad weather I mean it was raining. It seems to me like it rained right smart; I recollect cutting all the rice mostly in the weather. Haywood and Gillard and all of us were cutting about the same time; so was Williams. I could not tell you just when they threshed, but I know we all generally cut and threshed about the same time in the season; I recollect very well about Williams threshing, the first threshing he done. I was over the ground several times where Haywood and Gillard were threshing, and I was near it when they were threshing; they were right side of my field. It was wet all through that threshing season. They cut and threshed their rice about in the same kind of weather that I cut and threshed mine. As to how long we should wait before we thresh rice after there has been a heavy rain and the rice has been put in the shock, that depends on the weather; if it is good sunshine weather and windy, we wait sometimes two or three days, and sometimes longer, and sometimes not so long. Sometimes we wait a week or ten days, and sometimes not so long. It is sometimes necessary to thresh rice when it is wet, but not generally. I don't think it was necessary to thresh wet rice that fall. I don't know that any of my rice that fall was threshed when it was wet and damp, but I suppose some of it was threshed too wet; I tried, though, to thresh it all dry, mostly. It wasn't all dry when I threshed it, because I couldn't get it all dry. After the rice was threshed, most of it was hauled to the warehouse. Before they hauled it, it was drug out in rows from the separator, and then they would haul it right in. The roads were pretty bad at that time; but we were pretty close to the warehouse, and not over three-quarters of a mile to haul it. I don't know how long they would wait before they would haul their rice in, but I think they hauled it right in. If rice is left in the field, and it rains on it after it is put in the sack, it is damaged to some extent, if it is not taken care of. I think that season that some of my rice was damaged; some of it was affected that way, I know, and some of it I chopped the butts off of to keep it from being affected. I had to chop the butts off and scatter it out to dry it. When you chop the butts off, there is more or less dampness that goes through with the straw. I don't know whether Haywood and Gillard butted their rice or not; I am not positive of it, but I don't think they did. I am not certain whether Williams butted his; I am satisfied that he didn't butt the first that he threshed, or very little of it. I butted some of mine that was wet, and some of it I just spread out to dry; but that takes a good deal longer and is more expensive. Some of the farmers will go ahead and thresh their rice, to stop the expense of drying it, and to get through. Sometimes I work for the Old River Rice & Ir-

rigation Company, and sometimes I don't; I just work for them occasionally. I have worked for them off and on ever since I have been farming. In the fall of 1910 I was farming rice over there on land that I rented from the Old River Rice & Irrigation Company. I have a definite recollection that the weather conditions in 1910 were bad. I know very particularly the day that Mr. Gillard finished threshing rice—that is, the day that he quit threshing, that it was raining that day, and he never finished; he left about two loads of rice in the field. I had 270 acres of that land in rice. I don't know positively how many acres Haywood and Gillard had in rice, but I think they had something like 250 acres; they had about the same number of acres in that I had, but I could not say positively what they had. I could not say whether the conditions on my place were about the same as they were on the Haywood and Gillard place, because one man takes care of his farm different from another. I could not say that Haywood and Gillard were careless fellows. I could not say whether they took about as good care of their crop as I did of mine, because I was busy taking care of my own crop and I didn't notice them much. Out of that 270 acres that I had, I made some pretty good rice in 1910. Possibly I might have gotten about 1,000 sacks of No. 1 rice off of my place that year; I might have gotten more than that; possibly I got more than that which graded No. 1. I expect I got about 1,500 sacks of No. 2 rice that year off of my place, but I am not positive about that. I testified on a former trial of this case. Possibly I testified on the former trial that I could not tell you how many sacks of rice I got that season, but that it was graded into three grades, and that I got approximately 1,000 sacks of No. 1 rice, and about 1,500 sacks of No. 2 rice, and that about 500 sacks was graded between No. 2's and X's. I wouldn't say positively that I testified to that, because that has been some time ago, and I haven't been reading those things over."

Here it was agreed that the transcript of evidence from which counsel for plaintiff read to the witness, being the stenographer's report of the trial in the county court at law, is a correct report of the evidence. Continuing, the witness testified:

"I don't know how many sacks of No. 1 rice Haywood and Gillard got out of their crop; I was too busy looking after my own crop to tell what they were doing. When their rice was put in the warehouse, and mine was put in there, I moved away from this particular place down on the farm further, and I never was in the warehouse any more, only just to see that my rice was graded out. I said that some of their rice was threshed wet. Some of mine was threshed wet, but not as wet as theirs was, because the day they finished their threshing it was raining. I don't know how many sacks of rice they threshed that day; they could not have threshed many sacks, because it had been bad weather for several days, and they wanted to get through that day; it was raining that morning, and they finished up all they could, and it rained so much they could not finish at all. They failed to thresh 10 or 15 sacks of rice on account of the rain. When we get these threshers and hire them, we have to hurry up and get through. If a man don't own his own threshing outfit, he has to hire a man by the sack to do it. The thresher goes from one farm to another. I didn't have my own threshing outfit; I had Mr. Welch. I know the man who threshed for Haywood and Gillard, but I can't recall his name now."

A. R. Scherer testified:

That the landlord's portion of Haywood and Gillard's and Williams' rice was all stacked up

in the warehouse; that he did not know whether Williams' rice was hauled in the wagon that was covered, or whether theirs was; that on the 7th Gillard hauled 48 sacks, "and we didn't haul any; on the 8th we cleaned up, and hauled everything that was in the field, and so did he; on the 9th we hauled 12 sacks, and he hauled 16; on the 10th he hauled 27; on the 11th he hauled 32; on the 12th he hauled 68, and we hauled 144: and then we rested until October."

J. H. George, engineer on appellant's towboat, testified:

"In the early part of 1911 I was engineer on a towboat for the Gulf Coast Transportation Company. I was employed by them for seven or eight months. I began working for them about the 1st of March, as near as I can figure it out, and I worked for them until the day before Labor Day or the September following. Capt. J. W. Magee was captain of the towboat of which I was engineer. I understand that the captain is dead; he was drowned in the August storm of 1915. The towboat of which I was engineer was engaged in carrying rice on barges from Old river to Houston. I made every trip with Capt. Magee from the time I was employed until I quit. As to what kind of weather we traveled in during the period of time I was working for them: As far as bad weather is concerned, we never traveled in very bad weather, but just ordinary weather; we had a very bad place to come out of around Anahuac, and in bad weather it was very difficult to get out, because of the channel being so narrow, and we had to take our chances in getting out of there. We seldom ever traveled in rainy weather, and it always happened that we had very nice weather going across the bay. We have layed up there at Lawrence's Island a time or two, but they were just ordinary squalls, that didn't amount to anything. Lawrence's Island is inside, and not out in the bay. I never had occasion to go aboard the barges after they were loaded. When we would pick them up they would be laying at anchor, and we could not get alongside of them with the towboat because there were logs in the river, and we could not get up close to them for fear of breaking the wheel. I don't recollect any occasion, when we were out towing rice, when the rice was not covered; the rice was always covered. The covering was tied down to the barges with small lines that was run through the eyes of the tarpaulins and tied to the dunnage of the barge. The dunnage was made out of 2x4 with a 1x3 strip over the top of it. I remember taking a load of rice to the Pritchard Rice Mills. Capt. Magee kept a log book. The barges that we hauled were named the Annie, Spurlock, Dr. Collier, and the Kilgore, I believe, and the Jonathan Lane. I think we made only one trip to the Pritchard Rice Mills—one or two, I am not positive which. As well as I remember, on those trips that we made to the Pritchard Mills we had just ordinary weather; I can't say whether we had any rain or not, because that is quite a while back. I don't remember specifically either one of those trips, or what sort of weather we had during the trips. I said that sometimes we would be out in a little squall that didn't amount to much. I don't know that I could explain what a squall is, just exactly like it should be explained; but sometimes we would be out in a rain squall, and sometimes it would be a wind squall, and sometimes they would be mixed. I have been on the water a good deal. Judge Streetman has a boat down there that I navigate for him. I am not familiar with the Old River Lake; I have been across Old River Lake once, but that was in a very small boat. As to whether I have made any trips from warehouse No. 3, at Cove, to Houston: It is impossible to get to warehouse No. 3. We don't haul from the warehouse; we

pick the barges up out in the river. That Old River Lake is a mile wide and two miles long, or longer, I suppose. There are pretty good waves on it at times, because it is very shallow. That lake forms a kind of horseshoe. In going out from that lake, and coming up as far as Clinton, you come through open water a good deal of the distance, especially from Anahuac to Morgan's Point. At times there are considerable swells in there, and I guess sometimes they would run 3 feet high. With reference to the dunnage and those 2x4's and 1x3's: Those 2x4's were placed on the deck edgewise. I haven't any affirmative recollection of any particular trip as to just exactly how it was put down. I am talking about just the general custom. There were three of those 1x3's to each piece of dunnage, as well as I remember, and this dunnage lays side by side, which makes a complete flooring, with the exception of the openings between the 1x3's; it is somewhat of a half flooring; it isn't a solid floor. I would not undertake to swear that any particular load of rice would not get wet, even during my transportation of it during the times I worked for them. I am not testifying that no particular load of rice got wet, even while it was out there in Old River Lake waiting to be moved. In my experience in hauling and pulling barges, it is true that a barge, the front of which is not straight up and down, but leaning forward, the higher part being further forward than the bottom, that when swells are encountered that the tendency of that is to knock the water forward onto whatever is in front of it. We usually drop the barges back 50 or 75 feet from the tug, so as to keep the rush of the water from the propeller wheel from going against the barges. It is true that, if we tie them up closer than that, the water from the barge will be cast up onto the tug. If you tie one barge 4 or 5 feet behind the other barge, it is true that the back barge, 4 or 5 feet away from the other one, would throw water upon the other one, in coming across on a trip from Anahuac to Clinton; but as a rule you tie the barges as close together as you can, so you can step from one to the other. If you tie them 4 feet apart, the back barge would knock the water against the other in stormy or rough weather, and in ordinary weather there might be some spray go onto the barge. It wouldn't particularly knock the waves and water up there in ordinary weather, and it would not do that generally. You can't bring a barge across the bay without getting it wet; but they don't get wet all the time in the smoothest kind of weather. They get damp, though. I would not say that water gets on the barge on every trip, unless we have side boards to keep the water off, because there are times when you can come across there when it is perfectly smooth, and in that kind of weather you would have no opportunity to get water on the decks. Smooth water isn't an unusual occurrence. Lots of times you can find one, two, or three barges that come over perfectly dry, and then other times they are wet. As to whether their usual condition is wet: I never paid any particular attention to that, because I never examined them; I always noticed that when the barges got in they were more or less damp. That is their ordinary condition. It is a fact that when the wind is blowing, so as to strike the side of the barge, and there are swells of 3 feet, and the barge is loaded down to within 12 or 18 inches of the water, that the water will go up on the barge and on the load of whatever is in it. As to whether that would be true, whether the barge is being towed, or whether it is at anchor: If the barge was anchored, it would not be hit broadside. It is true that with the wind blowing the spray and waves would leash over the sides of the barge, if it was loaded down to within 12 to 18 inches of the water. We waited for our weather as a rule; but, if we got caught out in the weather, we had to take it any way we could get it. I said there were 2x4's placed on the deck for dunnage. Of course, the barge was decked over. On top of the 2x4's were placed 1x3 boards. The dunnage was about this long, and the 1x3's were placed crosswise of the barge. The sacks of rice would not be quite 7 inches from the deck of the barge, the 2x4 and 1 inch would make 5 inches. The deck of the barges are made in kind of an oval top, so as to shed water; in fact, all seafaring vessels are built that way. The ordinary way to transport freight on barges is to load the freight on the dunnage, and this rice I have been talking about was carried in the ordinary manner; in ordinary weather there was no reason why the spray from the sea or the swells should affect the rice on the barges."

[2] Beyond what has been quoted above, there, perhaps, is no testimony showing how any of the rice was stacked, handled, or treated after being put in the warehouse, although the testimony shows that only ventilation, which would be prevented by close stacking of sacks, would check the progress of damage caused by water. There seems to have been no testimony whatever bearing on the condition of the rice graded by Gano at the time it left the warehouse for transportation to Houston. Gano's examination was made after its arrival in Houston. Neither does there seem to have been testimony showing whether the barges loaded with the Gano rice were permitted to lie at anchor for a considerable period, without caretakers, as those containing the rice in controversy. The proof failed to follow the Gano rice in transit, to show that it was handled similarly to that in controversy.

It seems to be conceded that, if the rice graded by Gano had been shown to have been handled, stored, and transported to Houston under conditions and in manner substantially similar to the handling, storing, and transportation of the rice in controversy, in such event proof of the condition of the Gano rice and of the cause of such condition would have been a circumstance tending to show the cause of the damage to the rice in controversy. There was, however, a lack of proof along this line, and a failure of the proof of this similarity. Many factors might have caused the difference in the condition of the two loads. Some of those factors, possibly, were present in the case of one lot, and perhaps absent in the other. If the Gano lot of rice, however, was cared for in the same manner as the lot in controversy, the burden was upon the appellant to show that fact as a condition precedent to the offer of Gano's testimony, and it is contended that if the Gano rice was loaded and covered with the same kind of tarpaulins, if it was left alone in the lake for days and weeks to await a tow to Houston, if it was towed across Galveston Bay under the same conditions of tide, wind, and sea as the rice in controversy, it was for appellant to show these facts, to lay the predicate for the introduction of Gano's excluded testimony. The trip across the open waters of Galveston Bay,

as to the two loads of rice, whether the same was carried under the same circumstances, there seems to have been no proof along these lines, neither was it shown whether the time intervening between the trips across the Bay and Gano's examination of the rice was brief or long, or how the rice was handled and treated in the meantime.

Taking the record and testimony with reference to these matters, as a whole, we cannot say that the proffered testimony was wrongfully excluded. We are of opinion that evidence, as said by the court in Bock v. Fellman Dry Goods Co., 173 S. W. 582, that goes no further than to create a surmise or suspicion, does not raise a fact issue, and presents no question for submission to the jury. In view, as has been rightfully said, of the obvious opportunity for damage to the two loads, in varying degree, of unequal extent, and from different causes, proof of the cause of damage to one lot would not afford a basis for an opinion as to the cause underlying the damage to the other. These things would be going out into the field of surmise and conjecture, and suspicion, and we are of opinion that, reading the entire record and the testimony of the various parties who handled the Gano rice and the rice in controversy, the admission of the testimony did not and could not be other than conjecture. Therefore we are of opinion that the ruling of the court below was correct, and the assignment is overruled.

The second assignment complains of error in the court to the prejudice of defendant in not permitting the witness Gano to testify to the grades and conditions of the one-half of the rice crop which the Old River Irrigation Company received out of the Haywood and Gillard rice crop and the Williams rice crop for the year 1910, in that it was shown by the testimony of said defendant's witnesses that the one-half of said respective rice crops which was delivered to and received by the said Old River Rice & Irrigation Company was identical in kind and quality as the said Haywood and Gillard and the said Williams one-half of said crops, and had been subjected to the same weather conditions at the time the same was threshed and prepared for market, and that the said one-half of said crops have been shipped to the Pritchard Rice Milling Company, was, in the opinion of the witness L. B. Gano, an expert witness, damaged on account of having been threshed while wet; hence the court erred in excluding the testimony of the witness Gano who would have testified to facts showing that said rice approximately graded the same as the rice of the plaintiffs when the same was delivered under the defendant's shipping contract to the plaintiff at its mill in Houston, which proof was a strong showing that the rice was not damaged by defendant. What has been said heretofore disposes of this assignment,

and, seeing no merit in the same, it is overruled.

[3] The third assignment of error complains that the court erred in failing to give in charge to the jury defendant's requested special instruction No. 1, which is hereinbefore quoted in this opinion. The proposition under this assignment is that the defendant is entitled to a charge pertinently submitting its theory of the case to the jury. However, it is contended that there was no evidence that the rice in controversy was in worse condition at the time of shipment than at the time of delivery, and therefore that the court properly refused the charge submitting that issue. Furthermore, paragraph 5 of the court's general charge fairly submitted to the jury the appellant's theory that the damage complained of was caused by the initial wetting received at the time of threshing. There is no merit found in this assignment, and it is therefore overruled.

By appellant's fourth assignment of error it is complained that the court erred in refusing to give in charge to the jury defendant's special requested instruction No. 2, as hereinbefore set out. In paragraph 5 of the court's charge, the jury was charged as follows:

"If you believe from the evidence that the said shipment of rice was in as good a condition when it was so delivered to the Texas & New Orleans Railroad Company as it was when it was received from the plaintiff company by the Gulf Coast Transportation Company, or if you believe from the evidence that it was not in as good a condition when so delivered as it was when so received, but should further believe from the evidence that said rice became wet or damp before it was so delivered to the defendant Gulf Coast Transportation Company, and that the change, if any, in the condition of said rice was due to its becoming stack burned, heated, or musty on account of becoming wet (if you find it did become wet) before being delivered to the defendant Gulf Coast Transportation Company, you will, in either of said events, find for the defendant Gulf Coast Transportation Company."

We have already heretofore referred to and discussed the objection of appellee to the consideration of appellant's fifth assignment of error, which we have held to be well taken. In addition, the fifth paragraph of the court's general charge, as above set out, covered the matter complained of. The assignment, therefore, is overruled.

[4] By the sixth assignment of error, complaint is made that the court erred to the prejudice of defendant in refusing to permit it to prove by the witness J. E. Hatmaker, the warehouseman of the Old River Rice & Irrigation Company (which company loaded the rice in controversy on the barges of the defendant), that said witness was familiar with the general and customary manner in which rice was loaded by the said Old River Rice & Irrigation Company on said barges, and that rice was so loaded and carefully covered with tarpaulins securely tied down, so as to protect such loads of rice from the weather. It seems that the excluded testi-

mony would have no bearing upon the manner of loading the particular rice in controversy, but only to the manner in which rice was usually loaded. The manner of l ͏ ing the particular rice in controversy was shown by positive testimony. Therefore this testimony, in our opinion, was immaterial. Boddeker testified as follows:

"That rice was not loaded under a roof on the barges; the barges are all open, and the rice was put on the decks of the barges. They had a large canvas, which they covered the rice or the barge with when the rice was loaded. The canvas was the canvas they used generally for covering over the rice; at least, all they had at that time was heavy ducking, but I don't know the weight of that. You probably know what canvas is; it is about eight-ounce ducking. As to whether it was perfectly sound and waterproof, or whether it had holes in it: I can't say that it was waterproof, because it wasn't cured; at that time they didn't have any cured tarpaulins. That canvas had not been pickled, as the sailors call it. It wasn't just the ordinary canvas, like you buy it out of the store; they got heavier canvas, I presume, like they use for the sails. The canvas which they had wasn't new, because it had been in use. I know of my own knowledge that there were holes in it; there were some small holes in it. They put that over the rice after it was loaded on the barges. They probably loaded 15 or 16 tiers of sacks of that rice on each barge, piled one on top of the other; they are piled pyramid style, maybe about 10 at the bottom and gradually sloping up. The sacks were stacked flat. There were about 15 tiers of sacks on the barge altogether, and they would come up to about 8 or 9 sacks high, possibly. The canvas extended over the top of the rice plumb to the sides."

Therefore, there being positive testimony with reference to the loading of the particular rice in controversy, as said before, there was no error in excluding the testimony complained of. The assignment is therefore overruled.

We have examined this record, which is voluminous, carefully, considered the testimony, have carefully gone over the matters about which complaint is made, with reference to excluding the testimony, and have also carefully considered the special charges that were refused, although we were and still are firmly of the opinion that the same were not entitled to consideration, by reason of the fact that a bill of exceptions, as provided by law, to the exclusion of each of the requested instructions, is not a part of this record, and we have arrived at the conclusion that the appellant has had a fair and impartial trial of its case in the lower court; that no error, as presented by the record here, is apparent, of such magnitude that we would feel called upon to reverse the judgment on account thereof. The court and the jury, having heard the testimony, have decided against the appellant; and we cannot say that it is not a fair and just conclusion.

Therefore, being of the opinion that no such error has been committed as would justify us in disturbing the said judgment, the judgment of the court is in all things affirmed.

### On Motion for Rehearing.

[5] The appellant files a motion for rehearing in this case, in which it is suggested that two members of this court are disqualified from sitting in this case, upon the ground that the Texas & New Orleans Railroad Company is a party to this proceeding. It is further suggested that when this case was tried in the court below, and when the record was perfected on appeal, Hon. L. B. Hightower, Jr., Chief Justice of this court, was retained as attorney for the Texas & New Orleans Railroad Company at Beaumont, Tex., and it is stated upon information that Justice King was also retained for the same company at Nacogdoches, Tex.

With reference to the disqualification of these two members of the court, we have this to say: Speaking in and using the language first of the Chief Justice:

"From my recollection now, from this record, it is a fact that at the date of the filing of this suit in the lower court, and at the date of the disposition in the lower court, I was a member of the firm of Hightower, Orgain & Butler. The firm represented the Texas & New Orleans Railroad Company as division attorneys only, and in connection with such litigation only as arose within several counties, including Jefferson county, Tex., and certain counties contiguous thereto, namely, Liberty, Orange, Tyler, and Hardin counties; but said firm had no connection whatever with litigation of the Texas & New Orleans Railroad Company in counties other than those named, and had no connection whatever with this suit instituted in Harris county, nor was it cognizant even of the institution or pendency of such litigation, and was not connected in any manner with the Texas & New Orleans Railroad Company, except as above stated, as division attorneys in the counties named."

Using, also, the language of Justice King, we quote as follows:

"At the time of the filing of this suit, the firm of King & Seale were employed as local attorneys for the Texas & New Orleans Railroad Company, and such employment extended only to such cases as said company had in the courts of Nacogdoches county, Tex. My connection as local attorney at Nacogdoches for said company ceased on September 7, 1916, upon which date I moved to Beaumont. I have never been connected in any capacity with this suit, and never heard of same until it came up for consideration in this court."

Therefore it will be seen that both Chief Justice Hightower and Associate Justice King were only connected with the Texas & New Orleans Railroad Company in a local capacity. In other words, Chief Justice Hightower represented the said railroad company in the counties of Jefferson, Orange, Hardin, Tyler, and Liberty, and that he did not represent said company in any other counties, except the above-named; that he had no connection whatever with this suit; that he was not apprised even of the fact that such a suit had been instituted, or that it was being prosecuted; in other words, that he knew nothing of the existence of such a suit until the suit was filed in this court. Also, Mr. Justice King was only con-

nected with the Texas & New Orleans Railroad Company in a local capacity in his (Nacogdoches) county only, and had no cognizance of the existence of such a suit as the one in controversy, until the same had been brought to this court on appeal.

Therefore, in regard to the matter suggested as to the disqualification of two members of this court, it is just and proper to say that it is the opinion of the entire court that neither of said members of this court is in any way disqualified to sit upon and hear and determine said cause, and therefore, with reference to these matters, this court so holds. We have carefully examined the entire record in this case, perhaps more carefully, from the fact that all of the court, except the writer, were called in question as having been in some way interested in the matter, as having been counsel formerly for the Texas & New Orleans Railroad Company. We have neither the time nor the inclination to take up and critically examine the matters complained of in this motion for rehearing; in fact, it is just a rehash of the matters heretofore brought to the attention of this court.

The motion for rehearing is therefore in all things overruled.