BOCK v. FELLMAN DRY GOODS CO.
(No. 6737.)

(Court of Civil Appeals of Texas. Galveston. Jan. 14, 1915. Rehearing Denied Feb. 11, 1915.)

1. MASTER AND SERVANT ⊖⟐278—PERSONAL INJURY—FALLING DOWN ELEVATOR SHAFT —EVIDENCE.

In an action for death of an employé from falling down an elevator shaft, evidence held insufficient to show that the accident was caused by any negligence of defendant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⊖⟐278.]

2. MASTER AND SERVANT ⊖⟐265—INJURY TO EMPLOYÉ—BURDEN OF PROOF—CAUSE OF ACCIDENT.

In an action for death of an employé from falling down an elevator shaft, the burden of proof is on plaintiff to show, with reasonable certainty, how the accident occurred.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. ⊖⟐265.]

3. TRIAL ⊖⟐139—QUESTION FOR JURY—EVIDENCE.

Evidence, which goes no further than to create a surmise or suspicion, does not raise a fact issue.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. ⊖⟐139.]

4. NEGLIGENCE ⊖⟐121—PROXIMATE CAUSE.

It is not sufficient merely to show an accident and negligence on part of defendant, but the injury must have had causal connection with the negligence.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 217–220, 224–228, 271; Dec. Dig. ⊖⟐121.]

Error from District Court, Galveston County; Clay S. Briggs, Judge.

Action by Kate Bock against the Fellman Dry Goods Company. From a judgment for

defendant on a directed verdict, plaintiff brings error. Affirmed.

Marsene Johnson, Elmo Johnson, and Roy Johnson, all of Galveston, for plaintiff in error. Gill, Jones & Tyler, of Houston, and Mart H. Royston, of Galveston, for defendant in error.

PLEASANTS, C. J. This suit was brought by plaintiff in error against defendant in error to recover damages for the death of plaintiff's son, which it is alleged was caused by the negligence of defendant.

The petition alleges, in substance, that plaintiff's son, who at the time of his death was about 14 years of age and was in the employment of defendant, was killed while in the performance of the duties of his employment on February 11, 1911, by falling into an open elevator shaft or well in the store building of defendant, in the city of Galveston. It is alleged that the room in which plaintiff was performing his duties at the time he met his death, and in which the elevator shaft was situated, was poorly lighted; that the floor of said room, near the opening of said shaft, was greasy and slippery; and that the mechanism by which the gate closing the opening of said shaft was operated was out of repair and failed to close the gate as it should have done. The negligence relied on for recovery against defendant is thus charged in the petition:

"That the defendant knew that the plaintiff's said son was a small child about the age of 14 years, and that defendant was in duty bound to provide for the plaintiff's said son a safe and suitable place in which to work, and that it was in duty bound to have sufficient lights in and around its storehouse, so that plaintiff's said son could safely work, and that defendant wholly and negligently failed in said duties in all these matters; that defendant was in duty bound to keep the floor around said elevator clean and safe and to have the grease and other substances removed from said floor, so that plaintiff's said son would not slip on said floor when at work therein and thereupon, and that the defendant negligently failed to perform these duties to the plaintiff's son; that defendant was in duty bound to see to it that the entrance to said elevator shaft and well on said floor was securely fastened and barred by a gate or such other device as would be necessary to prevent plaintiff's said son from falling into or through said unguarded hole or shaft or well while at work, all of which defendant negligently failed to do, and that defendant's negligence in failing to have said hole and aperture closed and fastened at said time, while plaintiff's said son was working near said hole, was negligence; that the duty of inspecting said elevator and its appliances and the duty of seeing that the gates in front of the openings of said elevator were closed and fastened at all times when said elevator and its platform was not flush with said floor was a duty which defendant owed to the plaintiff's said son while he was working for it in the manner and place as aforesaid, and that the defendant wholly failed in all of these duties, and that all of said failures and omissions were negligence.

"And plaintiff further alleged that all of the negligent acts and omissions hereinbefore pleaded were the direct and proximate cause of the personal bodily injuries by her said minor son received and his consequent death, as hereinbefore pleaded.

"And plaintiff further alleged that defendant was guilty of negligence in the following matters and things, to wit: · That defendant was negligent in sending said small son of this plaintiff to work in and near said dangerous open elevator and its shaft, and that defendant was further negligent in failing to see to it that the doors to said elevator shaft were securely closed and fastened, and was further negligent in leaving said shaft door open and unprotected in any manner at said time, and that said negligence was the proximate cause of the injuries and death of her said son."

Damages were sought in the sum of $15,000.

In addition to general denial, defendant filed pleas of contributory negligence, assumed risk, and negligence of a fellow servant, and further pleaded that the deceased was a trespasser in the elevator room at the time he was killed by falling into the elevator shaft. After hearing the evidence, the trial court instructed the jury to find a verdict for the defendant, and, upon the return of such verdict, judgment was rendered in accordance therewith.

The evidence shows that Jennett Bock, the son of plaintiff, was about 14 years old at the time of his death. He was in the service of defendant at the time of his death; his duties, generally speaking, being to assist other employés in the store in wrapping and packing goods for delivery to customers. It may be inferred from the testimony that, on the occasion on which the accident occurred which resulted in his death, he had been sent to the room on the second floor of the store building, known as the elevator or freight room, for the purpose of getting empty boxes stored in said room, and which were needed in the salesroom on a lower floor of the building for use in packing goods for delivery to purchasers. The freight elevator, which was used for conveying goods to and from the basement and the upper stories of the building, ran up through this room. Jennett Bock did not use the elevator in going to this room, and he had been warned and instructed never to use it. The testimony introduced by plaintiff to show the circumstances in which the accident occurred is as follows:

George Peters testified:

"I am 18 years old. I reside in Galveston, Tex. On February 11, 1911, I was working for the Fellman Dry Goods Company. On said date I was acquainted with a boy named Jennett Bock. I saw Jennett Bock on February 11, 1911. He was in the freight room on the second floor of the new building of the company, at the north end, where the company then kept all the empty boxes. These were generally pasteboard boxes, and I was in there getting some empty boxes for the first floor wrapping counter in the new building. Jennett Bock was in there when I was. I last saw him with an armful of these boxes. He was gathering up more when I left. It was about half past 12, noon, or perhaps 25 minutes after 12, when I last saw Jennett Bock alive. The room in which I saw Jennett Bock, as near as I can figure it out and remember, was 12 or 14 feet wide and about 18 or 20 feet long. There was

one window to it toward the alley on the north wall. The window was frosted glass covered with netting. The room was inclosed on the east and south sides by frosted glass partitions and frames that did not go quite up to the ceiling. There was a door leading into it from the salesroom on the south. The freight elevator was operated up and down on the west side of this room, in an opening in the west wall. There was a big wooden gate, with pulleys and weights to the gate, used to keep the elevator shaft closed when the elevator platform was not still and standing even with the floor of the room. It was not very light in the room. It was pretty dark in there all the time. You could see upward where the light was where the partitions did not go up quite to the ceiling. You could hardly see the floor where you was walking at all. The floor was dirty and greasy. It was slippery, especially near the opening of the elevator shaft, where the gate was. There was great big boxes in the north end and corner, for trash. There was empty shirtwaist pasteboard boxes and other ready-made boxes stacked up all around the other sides of the room nearly as far as the frosted glass partitions went. * * * About 10 minutes after I left Jennett Bock in the freight room I saw him lying in the alley where he had been taken from the bottom of the elevator well. He was covered with blood, and was unconscious. As I have told you before, I saw him lying in the alley near the bottom of the shaft about 10 minutes after I had left him in the freight room. I went back into the room on the same floor where I was with the boy Jennett Bock after he fell through the shaft. After I got my dinner I went back into the freight room. The gate was down when I went back there then, but the rope to the weights of the gate was broken. The floor was dirty and greasy. There were marks in the floor by the opening where Jennett Bock fell through. In the room where I left Jennett Bock, after I went back after the Bock boy had fallen through the shaft, I saw Mr. Grimm, who sometimes worked the elevator, and Mr. Alphonse Fellman. One or two of the lady clerks came in there before I left. Mr. Fellman asked Mr. Grimm how the gate came to be open so the boy fell through. Grimm said the rope to the gate was broke. They were talking more when I went downstairs. As to what I was doing in the room with Jennett Bock shortly before he fell, one of the wrappers had sent me from the wrapping counter to get some empty boxes to put goods in that were to be wrapped and delivered to customers. Jennett Bock was getting boxes for the same purpose. He had his arms nearly full when I left him."

### Jacob Grimm testified as follows:

"I am 45 years old, and reside in Galveston, Tex. I was employed by the Fellman Dry Goods Company as a porter February 11, 1911. My duties were packing and inspecting freight, cleaning up, and running the freight elevator at different times. On February 11, 1911, I went to dinner about 12, noon, and got back to the store, I think, about a quarter to 1. I got in the freight elevator in the basement of the new building and ran it up to the second floor. It was one of my duties to operate the freight elevator. It was the duty of all the porters to do so, but the boys were not permitted to handle or use it at all. There were two white porters and several negro porters. I used the freight elevator to go up to the second floor, because I wanted to see about the work up there—about cleaning up. It was on Saturday. I stopped said freight elevator at the second floor of said building on said date. I walked through the door of the elevator room to the south and into the salesroom on that floor. I spoke to two of the lady clerks who were sitting on a table (it was the noon hour) in the

salesroom. Their names were, I think, Miss Randle or Miss Reynolds and Miss Artie. When I left the elevator platform and stepped out on said second floor the gate to said elevator was up, or open. The elevator platform or floor was flush with the floor of said second floor. The gate to said elevator, guarding the shaft thereof, was operated by ropes, pulleys, and weights. The elevator was operated by pulling a long rope attached to the machinery in the top of the building. If you wanted to go up you pulled this rope down; if you wanted to go down you pulled the rope up. The power used was electricity. The gate was an automatic gate in one way; that is, when you stopped the elevator I would lift the gate up so that I could get out, but when I got back in the elevator and started to go up or down, as the elevator went up or down, the gate would come back down to the floor and stop. After I left the elevator I went through the door of the freight room to the south on the same floor, as I said before, and closed the freight room door behind me. When I left the elevator I remember Miss Artie and Miss Reynolds were present. There might have been others; I don't remember. I remember that because they asked me for some apples I was eating out of a paper bag. I was away from the elevator at said time about one minute; would say not possibly more than a minute and a half. While I was talking to the two young ladies I heard a loud noise like a heavy box had fallen. I rushed back into the freight room where I had heard the noise. I do not know what made the noise. I have told you what it sounded like. When I got back to where I had left the elevator the freight elevator had gone up to the third floor and stopped. When I went back to the elevator at this time the gate was down. The rope that held the pulleys and weights to the gate was broken. I tried to get the freight elevator back down to the second floor, but the elevator would not work. I looked down through the elevator shaft and saw the boy, Jennett Bock, lying there at the bottom of the pit. He was unconscious. I ran downstairs and into the basement and took him up and put him in the freight room in the basement. I then notified Mr. Alphonse Fellman, the manager, to telephone for the ambulance. The boy was then put in the open air in the alley, and the blood was washed off. The boy never recovered consciousness. As near as I can judge, the weight of this gate with its pulley, ropes, and other attachments at said time was 150 to 200 pounds. A boy of the age of 13 or 14 years, having ordinary strength and health, could not have lifted said gate or have pushed said gate upward when the elevator was not run sufficiently high to have stepped into said elevator. It was all that I could do to lift it up, and I am a pretty strong man. The width between the platform or floor of the elevator and the floor of the building, when the elevator was standing still, was about an inch or an inch and a half. There certainly was not sufficient space for a boy to have fallen through the elevator shaft between the platform or floor of said elevator and the floor of the building, if said elevator was standing still and opposite said floor when I walked out and left the same prior to the time I heard the noise I have testified about. When I heard that noise I went back at once to where I had left the elevator, as I said before. I saw that the gate was down, and the ropes broken. The elevator had gone up to the third floor and stopped. I tried to get it back down to the second floor. It was out of order and would not work. The gate would sometimes get stuck when it was up, and would not come down. Mr. Bartell would grease it with oil and brush and make it work again. I looked down the shaft, as I said before, and saw the boy Jennett there. I knew Jennett Bock, who was employed by the Fellman Dry Goods Company

on said date. As I told you, Jennett Bock was in the freight room, then in the pit at the bottom of the shaft, and then I saw him in the alley stretched out on a quilt, and Mr. Alphonse Fellman was washing the blood off him. I saw Jennett Bock at the bottom of the elevator shaft somewhere about a quarter to 1, I think, or a minute or two later, when I saw him at the bottom of the elevator shaft unconscious, as I said before. He was lying on the bottom of the shaft. There was a crosspiece at the bottom of the shaft that the elevator rested on. In this crosspiece was two iron bolts sticking up about four inches high in and above the crosspiece. The side of the boy's head evidently struck this in falling, as there was a hole in his head near the eye—under his eye. He was taken in the alley and washed, as I said before."

On cross-examination the witness Grimm continued:

"It is a fact that I had taken the freight elevator from the lower to the second floor just a few minutes before Bock was injured; just about a minute or a minute and a half before the boy fell through the shaft. I left the elevator and went through the room the elevator opens into, and opened the door and went into the salesroom on the second floor, as far as the passenger elevator. This is not more than halfway to the southern end of the building. I closed the door to the freight room when I left it. It is a fact that when I got back to the elevator the booth door was closed, and that I found the elevator gate at the second floor down in its proper place. I opened the door and went into where I heard the noise come from. The elevator gate was down, but the rope of the weights and pulleys to the gate was broken. The elevator had gone up to the third floor and stopped. The elevator would not work when I tried it. As to how large the booth around the elevator shaft is, the room is about 10x10 or 12x12, as near as I can estimate. I would say that the walls are more than seven feet in height from the floor. It is not a fact that, in order to get to that freight elevator, a person must open the door of the booth or go through a door and then go some feet to the elevator, and that then there is a gate at the elevator. A person can come through the inclosed veranda or hall from the old building directly into the freight room and right by the freight elevator. This inclosed hall or walk goes across the alley from the second floor of the old building. There are no doors to this inclosed hall or chute in either building, except the heavy fire doors, and they were never closed. The fire doors are at least eight feet square. The opening into the hall or chute is the same space. The fire doors are to be closed only in case of fire, and we had none. Of course, if a person enters the freight room from the salesroom on the south, then he would have to open the door to the freight room which opens into the salesroom. It was this door I opened and went through when I came up during the noon hour of that day. There is a gate to the elevator, as I have before explained. Sometimes this gate got stuck and would not come down and close the opening until Mr. Bartell, the head porter, got oil and a brush and fixed it. Nobody was allowed to use the freight elevator, except mainly the porters, and sometimes the other grown men employed in the store; never the boys. The gate generally came down automatically, when the elevator would go from one floor to the next, on the floor from which the elevator starts, if it had been opened."

Another witness for plaintiff testified that he took the measurements of the opening in the elevator shaft through which Jennett Bock fell and of the gate used to close said opening. These measurements show that the opening in the shaft is between four and five feet wide. This opening is closed by a gate which works automatically as the elevator ascends or descends and drops to the floor of the room, thus closing the opening in the elevator shaft. Only the two side pieces of the framework of this gate rest on the floor when the gate is down. The main portion of the gate, when it is down, is 13 inches above the floor, leaving an open space under the gate of 13 inches by 4 feet 5 inches. The gate is about 4 feet high. As a result of his fall into the elevator shaft, Jennett Bock died a short time thereafter.

[1, 2] We have set out every word of testimony which tends to throw any light upon the cause of the accident which resulted in the death of Jennett Bock, and we agree with the learned trial judge that this testimony is insufficient to sustain a finding that the boy's death was caused by any of the alleged negligent acts or omissions of defendant charged in the petition. If it be conceded that the testimony is sufficient to justify the conclusion that defendant was wanting in ordinary care in failing to have the elevator room better lighted, or in permitting the floor of the room to become greasy and slippery, or in not keeping the elevator gate and the ropes and pulleys by which it was operated in safe and proper working condition, there is no evidence that any one or all of these omissions of defendant in any way contributed to the accident which caused the boy's death. The testimony furnished no reasonably probable explanation of how the accident occurred, and a finding that it was due to any of the negligent acts or omissions of the defendant charged in the petition would be based solely upon surmise, speculation, or conjecture. The burden was upon the plaintiff to show with reasonable certainty how the accident occurred; and, having failed to do this, there was nothing for the court to submit to the jury. The theory advanced by counsel for plaintiff that the boy, while passing near the elevator shaft, slipped on the greasy floor and rolled or skidded through the 13-inch space under the bottom of the elevator gate seems to us to be wholly improbable and unreasonable, if not impossible. So far as the alleged defects in the gate and the appliances by which it was operated are concerned, the evidence negatives the idea that such defects could have caused the accident, because the undisputed testimony shows that the gate fell into its proper place when the elevator went up, closing the opening to the shaft. It is hard even to conjecture what possible relation the failure to have the room better lighted could have borne to the accident. Speculate and conjecture as we may, no reasonable answer comes from the testimony to the question of "how did the accident happen."

[3] We fully recognize the rule that when, in any case, the evidence is sufficient to raise a fact issue, such issue cannot properly be

determined by the court, but should be submitted to the jury; but evidence that goes no further than to create a surmise or suspicion does not raise a fact issue, and presents no question for submission to a jury. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

[4] It is well settled that it is not sufficient merely to show an accident and show negligence on the part of the defendant, but, to entitle a recovery of damages for injury caused by the accident, the testimony must show causal connection between the accident and the negligence of the defendant. Railway Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; Railway Co. v. Crowder, 13 S. W. 381.

We are of opinion that the trial court properly instructed the jury to return a verdict for the defendant, and the judgment is affirmed.

Affirmed.