## BOCK v. FELLMAN DRY GOODS CO.
### (No. 66–2818.)

(Commission of Appeals of Texas, Section A.
June 11, 1919.)

1. MASTER AND SERVANT ☜285(5), 286(18)—
PERSONAL INJURY—SAFE PLACE TO WORK—
QUESTION FOR JURY.

In an action for death of an employé from
falling into an elevator shaft in a poorly lighted
room, with a greasy floor, bearing marks indi-
cating that he slipped and fell through an open-
ing under the gate, evidence *held* sufficient to
require the submission of the issues of defend-
ant's negligence and the proximate cause of the
accident.

2. MASTER AND SERVANT ☜278(1)—NEGLI-
GENCE—WEIGHT OF EVIDENCE.

Plaintiff, in an action for injuries to a serv-
ant, is only required to convince the jury by
fair preponderance of the evidence that the ac-
cident resulted from defendant's negligence.

3. MASTER AND SERVANT ☜276(2), 278(1)—
EVIDENCE—CIRCUMSTANTIAL EVIDENCE.

A master's negligence and the proximate
cause of injury to a servant may be established
by circumstantial evidence.

Error to Court of Civil Appeals of First
Supreme Judicial District.

Action by Kate Bock against the Fellman
Dry Goods Company. From a judgment of
the Court of Civil Appeals (173 S. W. 582),
affirming a judgment for defendant, plaintiff
brings error. Judgments reversed, and cause
remanded for another trial.

Marsene Johnson, Elmo Johnson, and Roy
Johnson, all of Galveston, and Ramsey, Black
& Ramsey, of Austin, for plaintiff in error.
Mark H. Royston, of Galveston, and Gill,
Jones & Tyler, of Houston, for defendant
in error.

STRONG, J. The plaintiff in error brought
this action against the Fellman Dry Goods
Company, a private corporation, to recover
damages for the death of her son, alleged to
have been caused by the negligence of de-
fendant. The trial court, after hearing the
evidence, instructed the jury to return a ver-
dict for defendant; and the judgment ren-
dered thereon was affirmed by the Court of
Civil Appeals. 173 S. W. 582.

The action of the trial court in withdraw-
ing the case from the jury is the only ruling
of which complaint is made.

The facts, briefly stated, show that deceas-
ed, a boy about 14 years of age, was employ-
ed by defendant, and was killed while in
the performance of the duties of his employ-
ment by falling into an open elevator shaft
or well in the store building of defendant in
the city of Galveston. Upon the occasion of
his injuries, deceased had been sent from the
first floor of the building to the second floor

into the elevator room, for the purpose of
getting some empty boxes. He used the
stairway in going to the second floor. Short-
ly after deceased reached the elevator room,
another employé, by the name of Grimm, ran
the elevator to the second floor, and, leaving
the platform or floor of the elevator flush
with the floor of the elevator room, passed
through the room where the boy was getting
the boxes into the salesroom. Grimm had
been in the salesroom but a short time,
when he heard a noise like a large box fall-
ing. He immediately returned to the eleva-
tor shaft, and found that the elevator had
ascended to the third floor of the building,
and that deceased had fallen to the bottom
of the shaft, thus receiving injuries resulting
in his death.

The plaintiff alleged that defendant was
guilty of negligence in failing to use due
care to furnish deceased a reasonably safe
place to work, in that: (1) The room in which
he was working at the time he met his
death, and in which the elevator shaft was
situated, was poorly lighted; (2) the floor
of said room, and especially near the opening
of the elevator shaft, was greasy and slip-
pery; (3) the gate to the elevator, and es-
pecially the closing equipment thereof, was
defective; and (4) the elevator shaft was
insufficiently guarded.

The only testimony which we regard as
material to the determination of the question
presented is as follows:

George Peters testified:

"I am 18 years old. I reside in Galveston,
Tex. On February 11, 1911, I was working for
the Fellman Dry Goods Company. On said date
I was acquainted with a boy named Jennett
Bock. I saw Jennett Bock on February 11,
1911. He was in the freight room on the sec-
ond floor of the new building of the company,
at the north end, where the company then kept
all the empty boxes. These were generally
pasteboard boxes, and I was in there getting
some empty boxes for the first floor wrapping
counter in the new building. Jennett Bock was
in there when I was. I last saw him with an
armful of these boxes. He was gathering up
more when I left. It was about half past 12,
noon, or perhaps 25 minutes after 12 when I
last saw Jennett Bock alive. The room in
which I saw Jennett Bock, as near as I can
figure it out and remember, was 12 or 14 feet
wide and about 18 or 20 feet long. There was
one window to it toward the alley on the north
wall. The window was frosted glass covered
with netting. The room was inclosed on the
east and south sides by frosted glass partitions
and frames that did not go quite up to the
ceiling. There was a door leading into it from
the salesroom on the south. The freight eleva-
tor was operated up and down on the west
side of this room, in an opening in the west
wall. There was a big wooden gate with pulleys
and weights to the gate used to keep the elevator
shaft closed when the elevator platform was not
still and standing even with the floor of the

room. It was not very light in the room. It was pretty dark in there all the time. You could see upward where the light was where the partitions did not go up quite to the ceiling. You could hardly see the floor where you was walking at all. The floor was dirty and greasy. It was slippery, especially near the opening of the elevator shaft where the gate was. There was great big boxes in the north end and corner, for trash. There was empty shirtwaist pasteboard boxes and other ready-made boxes stacked up all around the other sides of the room nearly as far as the frosted glass partitions went. * * * About 10 minutes after I left Jennett Bock in the freight room I saw him lying in the alley, where he had been taken from the bottom of the elevator well. He was covered with blood and unconscious. As I have told you before, I saw him lying in the alley near the bottom of the shaft about 10 minutes after I had left him in the freight room. I went back into the room on the same floor where I was with the boy Jennett Book after he fell through the shaft. After I got my dinner, I went back into the freight room. The gate was down when I went back there then, but the rope to the weights of the gate was broken. The floor was dirty and greasy; there were marks in the floor by the opening where Jennett Bock fell through. In the room where I had left Jennett Bock, after I went back after the Bock boy had fallen through the shaft, I saw Mr. Grimm, who sometimes worked the elevator, and Mr. Alphonse Fellman. One or two of the lady clerks came in there before I left. Mr. Fellman asked Mr. Grimm how the gate came to be open so the boy fell through. Grimm said the rope to the gate was broke. They were talking more when I went downstairs. As to what I was doing in the room with Jennett Bock shortly before he fell, one of the wrappers had sent me from the wrapping counter to get some empty boxes to put goods in that were to be wrapped and delivered to customers. Jennett Bock was getting boxes for the same purpose. He had his arms nearly full when I left him."

Jacob Grimm testified:

"I used the freight elevator to go up to the second floor. I stopped the elevator at the second floor of said building on said date. I walked through the door of the elevator room to the south and into the salesroom on that floor. * * * When I left the elevator platform and stepped out on the second floor, the gate to said elevator was up or open. The elevator platform or floor was flush with the floor of said second floor. The gate to said elevator guarding the shaft thereof was operated by ropes, pulleys, and weights. The elevator was operated by pulling a long rope attached to the machinery at the top of the building. If you wanted to go up, you pulled this rope down; if you wanted to go down, you pulled the rope up. The power used was electricity. The gate was an automatic gate in one way—that is, when you stopped the elevator I would lift the gate up so that I could get out, but when I got back in the elevator and started to go up or down, as the elevator went up or down, the gate would come back down to the floor and stop. After I left the elevator, I went through the floor of the freight room to the south on the same floor, as I said before, and closed the freight room door behind me.

* * * I was away from the elevator at said time about 1 minute; would say not possibly more than 1½ minutes. While I was talking to the two young ladies, I heard a loud noise like a heavy box had fallen. I rushed back into the freight room where I had heard the noise. I do not know what made the noise. When I got back to where I had left the elevator, the freight elevator had gone up to the third floor and stopped. When I went back to the elevator at this time, the gate was down. The rope that held the pulleys and weights to the gate was broken. I tried to get the freight elevator back down to the second floor, but the elevator would not work. I looked down through the elevator shaft and saw the boy, Jennett Bock, (deceased) lying there at the bottom of the pit. He was unconscious. * * * Sometimes this gate (of the elevator) got stuck, and would not come down and close the opening until Mr. Bartell, the head porter, got oil and a brush and fixed it. The gate would sometimes get stuck when it was up and would not come down."

The bottom of the elevator gate when down lacked 13 inches reaching the floor, leaving an open space under the gate of 13 inches by 4 feet 5 inches. The witness Johnson testified relative to the size and character of this opening as follows:

"I am 53 years old. My weight is about 148 pounds, I think. I could slip through that opening into the elevator well when the gate was down. A man my size could do so."

[1-3] We are of the opinion that the trial court erred in taking the case from the jury. While there was no direct testimony as to the cause of the accident, we think the jury might have ligitimately concluded from the circumstances in evidence that the accident was due to the negligence of defendant. The evidence suggests but two ways in which the accident could have occurred, viz. that when the elevator ascended to the third floor of the building, the gate failed to automatically close as intended, and, by reason of the dark condition of the room, the boy walked into the elevator shaft, or that the gate did close, and the boy slipped on the greasy floor and skidded through the open space under the bottom of the gate. In either event the evidence was sufficient to sustain a finding by the jury that the accident resulted from defendant's failure to furnish deceased a safe place in which to work. The plaintiff was not required to exclude the probability that the accident might have occurred in some other way. To so hold would impose upon her the burden of establishing her case beyond a reasonable doubt. She was only required to convince the jury by a fair preponderance of the evidence that the accident resulted from the negligence of the defendant. While it is true, as held by the Court of Civil Appeals, that in order to show that defendant's negligence was the proximate cause of the injury the evidence must present

something more than mere conjecture or surmise, it is equally true that the cause of an accident may be inferred from circumstances, Both negligence and proximate cause may be established by circumstantial evidence. The marks on the floor indicate that the boy slipped and fell into the elevator shaft. Whether the gate was up or down when he fell, the evidence was sufficient to show, in view of the fact that the floor was greasy and the room poorly lighted, that the failure to properly guard the elevator shaft was the proximate cause of the accident. As said by the Supreme Court of Iowa, in the case of Lunde v. Packing Co., 139 Iowa, 701, 117 N. W. 1068:

"A cause being shown which might produce an accident, and 'it further appearing that an accident of' that particular character did occur, it is a warrantable inference, in the absence of showing of other cause, that the one known was the operative agency in bringing about such result."

We are not to be understood as holding that a preponderance of the evidence tends to show either that defendant was guilty of negligence or that such negligence was the proximate cause of the accident resulting in the boy's death, but merely that the evidence was sufficient to require the submission of these issues to the jury for their determination. .

We are of opinion that the judgment of the Court of Civil Appeals and that of the trial court should be reversed, and the cause remanded for another trial.

PHILLIPS, · C. J. The judgment recommended by the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court. We approve the holding of the Commission on the question discussed.

