**EAST TEXAS THEATRES, INC.,**
**Appellant,**

v.

**Sheila Rutledge VOYLES et vir, Appellees.**

**No. 7948.**

Court of Civil Appeals of Texas.

Texarkana.

Aug. 12, 1969.

Rehearing Denied Sept. 23, 1969.

Tracy Crawford, Ramey, Brelsford, Flock, Devereux & Hutchins, Tyler, for appellant.

Scott Baldwin, Jones, Jones & Baldwin, Marshall, for appellees.

FANNING, Justice.

On September 25, 1966, Sheila Rutledge Voyles, while a paying and ticket holding patron of Paramount Theatre at its midnight show in Marshall, Texas, was struck on the head by a whiskey bottle thrown by some unknown person from the balcony of the theatre as the spectators were filing out of the theatre after the movie had ended.

The case was tried to a jury on special issues relating to primary and contributory negligence. In response to special issues 1, 5, 6, 7 and 8, the jury found to the effect: (issue 1) that during the performance of the show in question, the patrons in the balcony of the theatre were acting in a rowdy manner; (issue 5) that at such time as inquired about in Special Issue No. 1, the defendant, its servants, agents and employees, failed to remove such rowdy persons from the premises; (issue 6) that such failure was negligence; (issue 7) that such negligence was a proximate cause of plaintiff's injuries; (issue 8) the damages issue was answered in plaintiffs' favor in the amount of $31,250.00. The jury also answered the contributory negligence issues in such manner as to exonerate Sheila Rutledge Voyles of any contributory negligence.

Based upon the jury's findings, the trial court entered judgment for appellees in the amount of $31,250.00. Appellant has appealed.

Appellant by its points 1 to 6, inclusive, contend to the effect that there was "no evidence" to support the jury's findings to special issues 1, 5, 6, and 7, that there was "no evidence" to authorize the submission of said issues to the jury, and contending in effect that defendant was entitled to judgment in its favor as a matter of law. Appellant's points 1 through 6 inclusive, are in effect "no evidence" questions.

In considering the "no evidence" questions, we must consider only that evidence, if any, which viewed in its most favorable light, supports the jury's findings, and we must disregard all evidence which would lead to a contrary result. Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914); Ford v. Panhandle & S. F. Ry. Co., 151 Tex. 338, 252 S.W.2d 561 (1952).

Viewing the evidence most favorable to the judgment as we must, with reference to the "no evidence" questions, we state pertinent facts in this light as follows:

Appellee, Sheila Rutledge Voyles, was 17 years old on September 25, 1966, when she was injured at the Paramount Theatre in Marshall, Texas. She was a ticketholding patron for the midnight show. She had only been to a midnight show two or three times prior to the incident in question, and had not noticed any rowdiness in the shows prior to the instance in question.

Sheila testified that on the night of her injury that there was rowdiness in the theatre, but that she was attempting to watch the show and not pay attention to the rowdiness. The only quiet period she testified about was a period about one-half hour before the show was over, and that at the conclusion of the movie, she was in the aisle walking out when she was struck on the head by a whiskey bottle thrown from the balcony.

There was also other testimony regarding rowdiness during the performance of the movie. The witness Buddy Henderson testified to the effect that the rowdiness and throwing of objects down from the balcony continued throughout the performance and got worse toward the end, and he saw objects being thrown down toward the front, and everything. Though ap-

pellant characterizes the throwing as paper drifting down, Henderson testified specifically on this point as follows:

"Q. I am not talking about paper drifting down, I am talking about something being thrown out.

A. Yes, sir. I saw something being thrown out.

Q. On that specific night?

A. Yes, sir."

There was also testimony with respect to metal letters, as shown in the record as follows:

"MR. BALDWIN: Let me ask you one other question, Mr. Gelling, while we are here:

Q. You do have a closet up there that you have some letters that you use on the marquee?

A. Yes.

Q. Are they big metal letters about like that?

A. Yes.

Q. And, have you not had occasion of them being thrown in the movie, where you have to keep them locked up?

A. I keep them locked up, I don't use them any more.

Q. You don't use the metal letters?

A. No.

Q. But when you had them, I say, you have had occasion of them being thrown, to where you had to keep them locked up?

A. Yes, they are locked up."

Appellees in their brief comment and argue upon appellant's points 1 to 6 in part as follows:

"Although Mr. Gelling, the Manager of the theatre, testified that he had an employee, Charles Abercrombie, in the balcony to keep the peace up there, he was not, in fact, keeping the peace in the balcony according to the testimony of the witness, Henderson (S.F. 90–91). Henderson also testified that there was rowdiness all over the balcony (S.F. 95), and that performances in that theatre were usually rowdy and getting progressively worse over the last few months prior to the injury (S.F. 92–93). It is significant to note that he sees these things while he was merely a patron in the theatre and watching the show without paying particular attention to the rowdiness (S.F. 95–96), while Mr. Gelling is hesitant to admit much of this, according to his testimony.

"Mr. Gelling testified about searching the prospective patrons prior to the time that they came into the theatre for bottles, etc. (S.F. 99), and that he had a policeman whose job it was to stay "generally up in the balcony a good part of the time, most of the time, and on the lower floor" when Mr. Gelling needs him (S.F. 99). There have been many occasions of boisterousness in the theatre (S.F. 105). There have been many occasions when persons have been removed from the theatre because of their conduct (S.F. 104). Mr. Gelling also testified that because of prior occasions of them being thrown, he had to keep large, metal letters locked up in a closet in the balcony and that he no longer used those large, metal letters (S.F. 110–111).

"According to the testimony of Mr. Gelling, the limitations of his budget from East Texas Theatres concerning the number of personnel he can hire and the price he can pay for such personnel makes it pretty hard to get employees for the job Abercrombie had (S.F. 106–107). Abercrombie was interviewed for the purpose of running a mop (S.F. 106), though Gelling testified he intended to use him to keep the peace on occasions up in the balcony (S.F. 107). He made no inquiry into his background to determine his suitability for such a job other than whether

he could 'run a mop' (S.F. 106–107). Abercrombie was supposed to have been keeping the peace when the bottle was thrown (S.F. 107–108), although according to Mr. Gelling, Officer Burt was supposed to be in the balcony primarily. According to Burt's testimony, he did not go into the balcony during the entire evening (S.F. 160). There is a conflict between Mr. Gelling's idea of Mr. Burt's duties and Burt's idea of his duties, as Officer Burt indicated his primary duty was the lower floor and Abercrombie's primary duty was the upper floor (S.F. 160). Officer Burt testified that he, himself, heard disturbances in the balcony and did not go up there to quell the disturbance (S.F. 161), but was apparently relying on Abercrombie to do so (S.F. 160). It is significant to note that instead of controlling the crowd or working toward controlling the crowd until they were dispersed outside the theatre, Officer Burt immediately began checking the aisles to see that no one remained behind in the theatre and had already checked as much as one-third of the way up the aisle while the crowd was still in the theatre prior to the time of the occurrence in question (S.F. 163–164). It is also significant to note that in spite of Officer Burt's attempt to separate the responsibilities of peace-keeping into the main floor for himself and the balcony for Abercrombie, he knew he was down at the theatre to prevent any occurrence that might come up, if at all possible, and to control whatever did come up (S.F. 154). Further, that instances of midnight shows would be where his services are needed. Finally, Officer Burt felt that if he desired to and wanted to, he could have a seat and watch the movie (S.F. 168).

\*    \*    \*    \*    \*    \*

"Turning to the evidence in the case before the Court, we can see from Mr. Gelling's own admissions that he searched the patrons prior to their entry into the theatre for bottles, that there had been many instances of boisterous conduct prior to the occasion in question, that he had had to lock up metal letters in order to keep the patrons from throwing them inside the theatre; that it had become necessary to employ a policeman during the policeman's off-duty hours in order to keep order in the theatre and this would have been necessary only because of prior instances that Mr. Gelling, himself, would be unable to handle. The policeman-employee, Burt, testified that he heard disturbances in the balcony throughout the evening and did not even go up into the balcony to check on the disturbances or seek to quell them, though Mr. Gelling testified it was his job to do so and even Burt, himself, testified he was down there to prevent disturbances and to control them if they did arise. The witness, Henderson, testified about seeing objects thrown down from the balcony during the course of the movie and it is respectfully submitted that if a patron in the theatre can see objects being thrown, then a policeman on duty, whose job it is to thwart such activities, either also saw the objects or in the exercise of ordinary care, should have seen such and taken steps to prevent any further occurrence.

"Appellant places great stock on his theory that an ousting of 'the rowdy persons' would not have guaranteed that the person who threw the bottle would have been ousted and that since he may have still been there, the injury would still have occurred. While the converse of this might be true, it certainly is not conclusively proven by the evidence according to Appellant's contentions that the person throwing the bottle would have done so anyway, had such an act of control and supervision over the patrons in the balcony been performed. Rather, it would be considerably more probable that had even minimum supervision, such as a request by theatre employees to cease such rowdy behavior, or for the policeman to even go to the balcony and stand so that he might be seen by the patrons in the balcony, would have prevented the person who did throw the bottle from doing so because of his fear of being apprehended. That the theatre, by and

through its employees, in failing to give this minimum supervision or yet, the more burdensome elements submitted upon the part of the Plaintiff, failure to oust persons engaging in rowdy behavior, encouraged the wrongdoer by guaranteeing him anonymity in a crowd to the point that he felt he could and did, in fact, get away with throwing the bottle.

"We believe that under the evidence, the jury made the determination that when a crowd becomes boisterous or rowdy, that it should be controlled by the people who called the crowd together for monetary gain by the exercise of supervision over the crowd and its behavior with adequate personnel in order that members within the crowd can reasonably expect to be detected and apprehended in their wrongdoing, and that in the face of such supervision, there will be no wrongdoing by a member of the crowd. This standard of care placed upon the theatre by the jury in no wise requires that the theatre close its doors, or remove all of the patrons, but only requires a simple demonstration that the theatre intends to maintain order and harmony during the performance of its program.

"If, on the other hand, a theatre is doing all that a reasonably prudent theatre would do under the circumstances, then an argument such as Appellant has made here would have some merit. This, certainly, is not an unreasonable burden in view of the fact that the rowdiness in the theatre had been getting progressively worse over the past few months.

"An injury such as that received by Appellee is certainly foreseeable by one of prudence when a crowd of people become rowdy and disturbances are not quelled or controlled. * * *

"There is considerable other evidence in the record to show notice on the part of the theatre of the boisterous and rowdy attitude of the crowd, at least constructively from the witness, Henderson, who testified that he saw things being thrown out from the balcony other than the paper and that the rowdiness continued throughout the performance of the show and got worse toward the end. Considering this in the light of the theatre's notice of prior instances, as is obvious from Mr. Gelling's testimony about searching the prospective patrons for bottles prior to their entering the theatre, his testimony about the throwing of the large metal letters and having to have them locked up, the fact that it is necessary for him to employ an off-duty policeman to keep order in the theatre and the witness, Henderson's, testimony that the rowdiness had gotten progressively worse during the past several months furnishes additional unequivocal, undisputed proof in support of the submission and the jury's answers upon Special Issues Number 1, 5, 6 and 7. It is settled law in this jurisdiction that where Plaintiff is a paying patron within the theatre by invitation, the theatre owes her the duty to use ordinary care, not only to see that the premises were free from physical defects, but also to protect her from the wrongful acts of other patrons, provided it knew of or had reasonable grounds to anticipate such wrongful acts of other patrons. This is true even though the acts causing the injury were committed in' violation of penal laws. Southern Enterprises, Inc. of Texas v. Marek, 128 Tex. 377, 99 S.W.2d 594."

■ Of course, negligence, as well as proximate cause, may be proved by circumstantial evidence. Bock v. Fellman Dry Goods Company, Tex.Com.App., 212 S.W. 635 (1915).

■ Proximate cause "embraces at least two distinct concepts, both of which must be present: (1) there must be a cause in fact,—a cause which produces an event and without which the events would not have occurred; and (2) foreseeability." Baumler v. Hazlewood, 162 Tex. 361, 347 S.W.2d 560 (1961); Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957); Hopson v. Gulf Oil Corporation, 150 Tex. 1, 237 S.W.2d 352 (1951).

■ Ordinarily the issues of negligence and proximate cause are questions of fact for the determination of the jury. And for a decision contrary to the trial court findings on negligence and proximate cause, the Supreme Court would be required to find that reasonable minds could not differ as to the conclusions to be reached from the evidence. *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114 (1951).

■ The general rule is that the owner or proprietor of a place of amusement, to which the public is invited and admission is charged, has the duty of maintaining the premises to which patrons are invited in a reasonably safe condition for the uses for which they are intended. Though not an insurer of the safety of the property or persons of his patrons, he is charged with the duty to exercise ordinary and reasonable care for their safety and protection, that is, the degree of care that would be exercised by an ordinarily careful and prudent man in the same position and circumstances. To every patron the owner or proprietor impliedly warrants that such care has been exercised for the patron's safety, and failure of an owner or proprietor to perform this duty may constitute negligence that renders him answerable in damages to one who suffers injury as a proximate cause of that negligence, if the injured person did not assume the risk of the injury, or contribute to the injury by his own negligence. 55 Tex.Jur.2d, Theatres, Shows, Etc., § 13, p. 247 to 250, incl.

■ A possessor of land who holds the land open to patrons for business purposes has a duty to prevent tortious acts of third parties to his patrons, or to warn his patrons of the possibility of such tortious acts. The law regarding this duty is set forth in § 344 of the Restatement of Torts, 2d:

"'A. * * * possessor of land who holds it out to the public for his business purposes is subject to liability to members of the public while upon the land for such a purpose for bodily harm caused to them by the accidental, negligent or intentionally harmful acts of third persons * * * if the possessor by the exercise of reasonable care could have

(a) discovered that such acts were being done or were about to be done, and

(b) protected the members of the public by

(i) controlling the conduct of the third persons, or

(ii) giving a warning adequate to enable them to avoid the harm * *.' "

Comment f to said § 344 states as follows:

"Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience that there is a likelihood of conduct on the part of the third persons in general which is likely to endanger the safety of the visitor, even though he had no reason to expect it. on the part of any particular individual. If the place or character of his business, or his past experience is such that he should reasonably anticipate a careless or criminal conduct on the part of a third person, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection."

The parties have cited many cases relating to appellant's points 1 to 6. None of these cases are exactly in point. From our investigation it is our view that the most authoritative case which is in some respects analogous to the case at bar is *Marek v. Southern Enterprises, Inc. of Texas,* Tex.Com.App., opin.adopt., 128

Tex. 377, 99 S.W.2d 597 (1936), opinion by Commissioner Hickman (later Chief Justice of the Texas Supreme Court). We quote from the court's opinion in part as follows:

"The facts show that plaintiff became a patron of the theatre about midnight on December 31, 1931, for a New Year's Eve performance. Shortly after she and the other members of her party were seated some unidentified persons in the theatre began throwing firecrackers and torpedoes promiscuously over the auditorium. One such torpedo or firecracker exploded near plaintiff's head causing her to suffer, among other injuries, the loss of hearing of one ear.
* * *

"While the plaintiff's petition is drawn in rather general terms, we think that, as against the general demurrer and special exceptions leveled against it, same is sufficient to charge that the defendant was negligent in not taking the proper precaution to prevent plaintiff's injury after the exploding of firecrackers and torpedoes started in the theatre. That was the theory of liability submitted to the jury in the trial court.

"Those who conduct places of public amusement to which an admission fee is charged owe the duty to exercise ordinary care for the safety of their patrons. The relationship of proprietor and patron gives rise to that duty. Although the proprietor may be guilty of no negligence in regard to a danger in its incipiency, still, if after it arises he has time to prevent injuries to his patrons, it is his duty to exercise ordinary care to do so. His duty differs from that of a carrier of passengers only in the degree of care required. Inpendent of authorities, sound reason would dictate the rule. But authorities are not lacking. Those cited by the Court of Civil Appeals support it, to which may be added Moone v. Smith, 6 Ga.App. 649, 65 S.E. 712.

"We have made an independent investigation of the testimony and, while conceding that, on the question of whether defendant could have prevented plaintiff's injury by the exercise of ordinary care after it knew that the throwing of torpedoes and firecrackers had started in the theatre, it is rather meager, still we are unable to say, as a matter of law, that the record is bare of any evidence on the question. There is evidence that the throwing of fireworks had gone on for several minutes before plaintiff was injured, and that defendant did nothing to stop the practice or to protect its patrons from dangers arising therefrom. There is also evidence tending to show that the theatre was in practical darkness, and that after the throwing of fireworks started no lights were turned on and no remonstrance made.

"Let it be presumed that the persons who were throwing the torpedoes and firecrackers knew that they were committing acts in violation of the Penal Statutes of this state and penal ordinances of the city of Dallas. That fact would not relieve the defendant of liability. It owed the same duty to protect its patrons from unlawful acts as it did to protect them from boisterous conduct of others not defined as a penal offense. To our minds the fact that the persons throwing these dangerous fireworks knew that their acts were unlawful constitutes some evidence tending to show that, had defendant turned on the lights and remonstrated with them, such throwing would have stopped. We think the jurors had the right, in the exercise of their best judgment based upon their common knowledge and experience, to conclude that, had the lights been turned on, so that the guilty persons could have been seen and identified, they would have desisted from their unlawful conduct. The question presented is one calling for the exercise of the judgment of the jury and is not

a question of law for the determination of this court. * * * "

After carefully reviewing the record it is our view that there was evidence of probative force to support the jury's findings to special issues 1, 5, 6, and 7. Appellant's points 1 through 6 are overruled.

We further hold that the evidence was sufficient to support the jury's findings to special issues 1, 5, 6 and 7. Also, after carefully considering and reviewing the entire record in this case in the light of the rules announced in the case of In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, (1952), it is our further holding that the jury's findings to special issues 1, 5, 6, and 7 were not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Appellant's point 7 is overruled.

We also hold that the lay testimony alone of Sheila Rutledge Voyles was evidence of competent probative force to sufficiently establish that the blow to her head (caused by the throwing of the whiskey bottle which struck her head) was the cause of her injuries and complaints. In this connection, Sheila testified that prior to the injury in question she was in good health and never suffered from any of the conditions ensuing after her injury as described by her in her testimony. This is not a leukemia case, gallstone case, cataract case, high blood pressure case, or the type of case where medical evidence is necessary to establish causal connection. We think that in a case of this character that a jury can conclude that a blow to the head caused by a thrown missile, such as a whiskey bottle, will cause pain and injury to the head to some extent, that a severe blow to the head can cause periods of unconsciousness and blackouts, that such a blow to the head can cause nausea, and that pain in the head can cause distress and nervousness. We think from the record in this case the lay testimony alone of Sheila was amply sufficient to establish

causal connection and that it was unnecessary for her to rely on the medical testimony of her doctor, Dr. Shipp. We, therefore, deem it unnecessary to determine whether Dr. Shipp's testimony is also sufficient to establish such causal connection. Appellant's 8th and 9th points are overruled.

We further hold that the jury's finding to special issue No. 8 is supported by evidence of probative force, that the same was sufficient and was not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, and that the amount of damages as found in special issue No. 8 was not excessive under the record in the case. Appellant's points 9, 10, 11 and 12 are overruled.

The judgment of the trial court is affirmed.

DAVIS, J., not participating.